Leah S. CAMPBELL *v.* STATE of Arkansas

CA 94-1375                                    912 S.W.2d 446

Court of Appeals of Arkansas
Division II
Opinion delivered December 20, 1995

148

*William R. Simpson, Jr.*, Public Defender, by: *C. Joseph Cordi, Jr.*, Deputy Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *Angela S. Jegley*, Senior Asst. Att'y Gen., for appellee.

JOHN E. JENNINGS, Chief Judge. This is an appeal from an order involuntarily committing the appellant to the Arkansas State Hospital for a forty-five day period. The sole argument raised on appeal is that there was insufficient evidence to support the probate court's finding that appellant posed a clear and present danger to herself or others. We àgree and reverse and dismiss.

On October 6, 1994, Mrs. Lyda Campbell filed a petition seeking the involuntary commitment of her daughter Leah Campbell for treatment of mental illness. Leah Campbell is a thirty-six-year-old board-certified psychiatrist. The petition alleged that Dr. Campbell had "at least a four-year history of mental illness" and that on the 5th of October the manager of Forest Place, the apartment complex where Dr. Campbell lived, told the petitioner that Dr. Campbell had physically attacked a Terminix man who was spraying her apartment and "nearly pushed him off the second floor balcony." The manager said that Dr. Campbell would have to move because it was her second assault, in that she had tried to attack a maintenance man two weeks earlier. The manager also complained that Dr. Campbell was walking about wearing only a bathrobe. The petition also alleged that Dr. Campbell had screamed that the petitioner was going to hell and slammed a door and refused a request from her father on the same date to get help. It said that Dr. Campbell had walked off two jobs since returning to Little Rock in August 1993 and was not getting care for her illness. The petition also alleged that she was dependent

on her mother and father for support. The petition listed Margaret Raney, the manager of Forest Place, as an additional witness.

On October 7, 1994, the Pulaski County Probate Court held a hearing to decide whether Dr. Campbell should be committed for a seven-day period for evaluation. Lyda Campbell testified that she and her husband saw their daughter on October 4 and asked her to get some treatment "because she was unemployed and had run out of money." She testified that on October 5, Dr. Campbell was very rude to her parents and acted with hostility toward them. She testified that the statement about a four-year history of mental illness was based on what "mutual friends in New York" had told her.

Margaret Raney, the assistant manager at the apartment complex where Dr. Campbell lived, also testified. She said that on approximately September 14, 1994, Dr. Campbell came into her office upset because she had been to her bank to withdraw money to take a cruise and had been told her account only had $20.00 in it. Dr. Campbell told Ms. Raney that she felt like the bank manager was happy about not giving her the money. Ms. Raney testified that Dr. Campbell then lit a cigarette despite a sign on Ms. Raney's desk that says, "Please, do not smoke." When a gentleman who happened to be in the office, whom Ms. Raney described as a native American, called Dr. Campbell's attention to the sign, she told him to "shut the blank up" and called him a "spic." In the course of the conversation Dr. Campbell told Ms. Raney that she hated her parents and that "if it were not for prison, she would murder them O.J. Simpson style." Ms. Raney testified that Dr. Campbell then got up and made some gestures that "mimicked a chimpanzee." Ms. Raney said that Dr. Campbell seemed to be "a very upset lady on the edge." Ms. Raney also testified that she had observed Dr. Campbell walk across the parking lot in her bathrobe without any undergarments.

Dr. Campbell testified that she acted with "some hostility" toward her parents because they came to her apartment to take her car away for the second time in the recent past. She testified that she was treated as an outpatient for depression about a year ago after she had returned to Little Rock. She testified that she could have made the statement that she would like to kill her

parents because they "continually come over and provoke arguments with me and set up very frustrating situations." She conceded that she had been outside in her bathrobe in the past when her cat had gotten out.

On this evidence the court ordered the involuntary commitment of Dr. Campbell for the purpose of a seven-day evaluation.

On October 14, 1994, the probate court held a second hearing. The only witness was Dr. Jarrod Adkisson, a second-year resident at the University of Arkansas for Medical Sciences, working as a psychiatrist for the Arkansas State Hospital. Dr. Adkisson testified that he had diagnosed Dr. Campbell as "bipolar, type II." He testified that "type II"

> indicates that within the last two years there has been an episode of major depression, which did occur last year by her own report. That also implies that there aren't a lot of specific criteria to meet what we would call a florid, grandiose, manic stage, that there are activities which we consider to be hypomanic, which in themselves would be some of the intrusiveness that she's shown, from the impulsivity, some of the difficulties that she has shown both in her professional life and in her private life. It does meet the criteria for bipolar type disorder, but it's a lesser diagnosis, less severe—it's not as severe a form of bipolar as the regular bipolar diagnosis.

Dr. Adkisson testified that Dr. Campbell had shown some evidence of hostility toward staff and some evidence of "bizarre behavior." He testified that she made the comment that she threw up her medication because the Italians made her do it. He testified that "another night she got angry at staff and made a rather flippant remark that she might get out of here and kill somebody." When asked about it the next day, "she said that she was upset and had gotten angry with the staff, but denied any [intention] of wanting to hurt herself or anyone else." Dr. Adkisson recommended that Dr. Campbell begin a trial treatment of the drug Lithium, but that she had refused to begin treatment. He testified that a drug screen was performed on appellant and that it was negative.

Finally, Dr. Adkisson testified repeatedly that Dr. Campbell was not currently a danger to herself or anyone else and that she did not require any further inpatient treatment. He testified that he believed she suffered from a "mood instability."

After hearing the evidence the court stated that there was ample evidence to indicate Dr. Campbell suffered from a mental illness and needed some treatment. The order involuntarily committing Dr. Campbell for a forty-five day period stated that the court found by clear and convincing evidence that Dr. Campbell posed a clear and present danger to herself or others.

The case at bar is moot in a sense because the forty-five day commitment order has run its course. We nevertheless decide this case on its merits because this kind of proceeding will almost always become moot before the litigation can run its course and a decision here might avert future litigation. *See Campbell* v. *State*, 311 Ark. 641, 846 S.W.2d 639 (1993).

In order to obtain a forty-five day commitment order the State bears the burden of proving by clear and convincing evidence that the person sought to be committed is a clear and present danger to himself or others. Ark. Code Ann. § 20-47-214(b)(1)(A) (Repl. 1991). Arkansas Code Annotated section 20-47-207(c) (Repl. 1991) provides:

> (c) INVOLUNTARY ADMISSION CRITERIA. A person shall be eligible for involuntary admission if he is in such mental condition as a result of mental illness disease or disorder that he poses a clear and present danger to himself or others;
>
> (1) As used in this subsection, "a clear and present danger to himself" is established by demonstrating:
>
> . . . .
>
> (C) The person's behavior demonstrates that he so lacks the capacity to care for his own welfare that there is a reasonable probability of death, serious bodily injury, or serious physical or mental debilitation if admission is not ordered.
>
> (2) As used in this subsection, "A clear and present dan-

ger to others" is established by demonstrating that the person has inflicted, attempted to inflict, or threatened to inflict serious bodily harm on another, and there is a reasonable probability that such conduct will occur if admission is not ordered.

■■ When the burden of proof in the trial court is by clear and convincing evidence, our standard of review is whether the trial court's finding is clearly erroneous. *See Freeman* v. *Freeman*, 20 Ark. App. 12, 722 S.W.2d 877 (1987). We give due deference to the superior position of the probate judge to evaluate the evidence. *See Warren* v. *Tuminello*, 49 Ark. App. 126, 898 S.W.2d 60 (1995). In the case at bar there is certainly ample evidence to support the trial court's finding from the bench that Dr. Campbell suffered from a mental illness and needed some treatment. We are convinced, however, that the court's determination that the State proved by clear and convincing evidence that Dr. Campbell posed a clear and present danger to herself or others is clearly erroneous. While two assaults were alleged in the original petition, we note that neither Lyda Campbell nor Margaret Raney gave any testimony relating to any assault. The only witness at the forty-five day commitment hearing, Dr. Adkisson, testified unequivocally that Dr. Campbell did not pose a danger to herself or anyone else. We do not doubt that the probate judge was attempting to help the appellant nor do we doubt that the appellant needed help. Even so, an order of involuntary commitment may not issue unless the statutory requirements are met.

■ The order of the probate court is reversed and dismissed and the record of appellant's involuntary commitment is to be removed from her record at the Arkansas State Hospital. *See Campbell* v. *State*, 311 Ark. 641, 846 S.W.2d 639 (1993).

Reversed and dismissed.

ROBBINS, J., and BULLION, S.J., agree.