375 Ark. 402

**Rufus Homer ADAMS, Appellant,**

v.

**ARKANSAS DEPARTMENT OF HEALTH AND HUMAN SERVICES, Appellee.**

No. 08–806.

Supreme Court of Arkansas.

Jan. 22, 2009.

Val P. Price, Jonesboro, for appellant.

Gray Allen Turner, Office of Chief Counsel, Little Rock, for appellee.

PAUL E. DANIELSON, Justice.

The instant case is a no-merit appeal from an order of long-term protective custody filed by counsel for appellant Rufus Homer Adams. The order awarded long-term custody of Mr. Adams to appellee Arkansas Department of Health and Human Services (DHS). Mr. Adams's brief presents this court with an issue of first impression, that is, whether a court-appointed attorney for an alleged endangered, indigent adult can file an *Anders* no-merit appeal from an order of long-term custody in an adult-protective case. Assuming that an *Anders* no-merit appeal is possible, counsel for Mr. Adams asserts that the circuit court did not err when it awarded custody of Mr. Adams to DHS. We adopt herein the *Anders* no-merit procedures for appeals by indigent adults subject to orders of long-term custody, and we affirm the circuit court's order and grant counsel's motion to withdraw.

On February 22, 2008, DHS filed a petition for emergency custody, asserting that it should be granted custody of Mr. Adams because

> the circumstances or conditions of [Mr. Adams] are such that returning to or continuing at [his] place of residence or in the care and custody of a parent, guardian, or other person responsible for [his] care presents imminent danger to [his] health or safety. [Mr. Adams] lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents imminent danger to [his] health or safety.

Attached to the petition was an affidavit from Adult Protective Services, stating, in part, that Mr. Adams had been evaluated and was found to be incapable "of managing his medications or his finances and was not capable of independent living." The affidavit stated that Mr. Adams suffered from Type 2 Diabetes, coronary artery disease, and hypertension, and that Mr. Adams admitted difficulty with his memory, due to a stroke a few years prior. It further provided that Mr. Adams continued to "be confused and have memory

problems" and appeared "to have little understanding of the consequences of his actions." As a result of the petition, the circuit court issued an ex parte order of emergency custody.

On March 3, 2008, the circuit court filed a probable-cause order, in which the circuit court declared Mr. Adams indigent, appointed counsel, and set a hearing on long-term custody for March 24. Following that hearing, the circuit court filed an order for long-term protective custody, awarding DHS custody of Mr. Adams. In its order, the circuit court found that

> [r]espondent lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents an imminent danger to his health or safety. More specifically: Mr. Adams has been diagnosed with Type 2 Diabetes, coronary artery disease, and hypertension. Dr. Jim Pang states that in his opinion Mr. Adams is not capable of managing his medications or his finances and not capable of independent living. Mr. Adams does not have any family willing or able to assist him with independent living nor does he believe he needs assistance. Mr. Adams claims to have an apartment in Osceola ready to move in but has been unable to tell anyone the address.
>
> 4. Respondent is unable to provide for his own protection from abuse, neglect, or exploitation.
>
> 5. That the Respondent did not have a caregiver, responsible for his protection, care, or custody.

The circuit court then found by clear and convincing evidence that Mr. Adams was in need of placement and awarded long-term custody of Mr. Adams to DHS. On April 22, 2008, Mr. Adams filed his notice of appeal, and counsel for Mr. Adams has presented this court with the instant no-merit brief and a motion to withdraw. Mr.

Adams was given thirty days to respond to his counsel's no-merit brief, and various documents from Mr. Adams were received September 19, 2008. We turn now to the instant appeal.

## I. Adoption of No–Merit Procedures

■ For the first point on appeal, counsel for Mr. Adams, citing to this court's recent adoption of a no-merit procedure for dependency-neglect cases, urges this court to adopt a no-merit procedure for appeals from orders of long-term custody under the Arkansas Adult Maltreatment Act, Arkansas Code Annotated §§ 9–20–101-9–20–121 (Repl.2008). Specifically, counsel requests that "the Court adopt a No Merit procedure, accept this No Merit brief as compliant with a No Merit procedure, [r]ule on the merits of the case and allow him to withdraw." DHS responds, requesting that counsel's motion to withdraw be granted and the appeal be dismissed.

In *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), the United States Supreme Court, in an effort to protect an indigent defendant's right to counsel on appeal, adopted the following procedure for counsel's withdrawal, where counsel has conscientiously determined that the appeal contains no meritorious issues:

> [Counsel's] role as advocate requires that he support his client's appeal to the best of his ability. Of course, if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he

chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal.

386 U.S. at 744, 87 S.Ct. 1396. The question presented in the instant appeal is whether the no-merit *Anders* procedures should be applied to appeals from orders of long-term custody pursuant to the Adult Maltreatment Custody Act.[1]

The purpose of the Adult Maltreatment Custody Act is to:

(1) Protect a maltreated adult or long-term care facility resident who is in imminent danger; and

(2) Encourage the cooperation of state agencies and private providers in the service delivery system for maltreated adults.

Ark.Code Ann. § 9–20–102 (Repl.2008). To that extent, the Act gives jurisdiction to the probate division of the circuit court over proceedings for custody, temporary custody for purposes of evaluation, court-ordered protective services, or an order of investigation pursuant to the Act. *See* Ark. Code Ann. § 9–20–108(a)(1) (Repl.2008).

The Act further sets forth the procedures to be followed under the Act.

In *Linker–Flores v. Arkansas Department of Human Services,* 359 Ark. 131, 194 S.W.3d 739 (2004), this court adopted the *Anders* no-merit procedures for appeals by indigent parents, which stem from termination-of-parental-rights proceedings. In *Linker–Flores,* we observed that, pursuant to statute and relevant case law, indigent parents in Arkansas had a right to counsel on appeal.[2] Given that right, we then examined the "extent of counsel's obligations when counsel believes the appeal is frivolous." 359 Ark. at 138, 194 S.W.3d at 745. After reviewing a variety of jurisdictions that had addressed both sides of the issue, we concluded that "[b]ecause . ·. the benefits from the *Anders* protections to the indigent parent's right to counsel outweigh the additional time such procedures require, the *Anders* procedures shall apply in cases of indigent parent appeals from orders terminating parental rights." *Id.* at 141, 194 S.W.3d at 747.

In the same vein, we must initially determine whether an indigent adult subject to an order of long-term custody has a right to counsel on appeal. Indeed, such an adult is entitled to counsel during the proceedings against him in the probate court, pursuant to the Act itself. Under the Adult Maltreatment Custody Act, the adult subject to custody shall be served a copy of the petition for custody, as well as notice of the hearing to be held on the

---

1. We recently declined to consider whether the no-merit *Anders* procedures should apply to appeals from civil-commitment orders, finding that the appeal at issue was moot. *See Dickinson v. State,* 372 Ark. 62, 270 S.W.3d 863 (2008).

2. The pertinent statute provided:

In all proceedings to remove custody from a parent or guardian or to terminate parental rights, the parent or guardian shall be advised in the dependency-neglect petition or the ex parte emergency order and the first appearance before the court of the right to be represented by counsel *at all stages of the court proceedings and the right to be appointed counsel if indigent.*

Ark.Code Ann. § 9–27–316(h)(1) (Supp.2003) (emphasis added).

petition. *See* Ark.Code Ann. § 9–20–111(a), (b)(1) (Repl.2008). In addition, the pleadings served on the adult shall "include a statement of the right to: (1) Effective assistance of counsel; (2) Be present at the hearing; (3) Present evidence on the respondent's own behalf; (4) Cross-examine witnesses who testify against him or her; (5) Present witnesses in the respondent's own behalf; (6) Remain silent; and (7) View and copy all petitions, reports, and documents retained in the court file." Ark.Code Ann. § 9–20–111(c). Further evidence regarding the adult's right to counsel is found in Ark.Code Ann. § 9–20–116(b)(1) (Repl.2008), which directs the probate court, at the probable-cause hearing, to make certain inquiries of the adult regarding counsel, including:

(A) Whether the maltreated adult has the financial ability to retain counsel; and

(B) If the maltreated adult does not have the financial ability to retain counsel, whether the maltreated adult is indigent.

In addition, the court shall inform the adult of the right to effective assistance of counsel and, if the adult is indigent, appoint counsel for the adult. *See* Ark.Code Ann. § 9–20–116(b)(2). The Act, thus, makes clear that an adult, subject to a petition for custody pursuant to the Act, is entitled to effective assistance of counsel during the probate-court proceedings.

While it is clear that the adult subject to the Act is entitled to counsel in the proceedings before the probate court, no mention is made in the Act regarding the adult's entitlement to counsel on appeal, which was the guiding principle for our decision in *Linker–Flores*. Nonetheless, it

would defy logic were we to hold that such adults ordered into long-term custody under the Act, who were entitled to counsel during the probate-court proceedings, were not entitled to counsel on appeal. Here, Mr. Adams was entitled to counsel during the proceedings before the probate court, he was entitled to appeal the order of the probate court,[3] and, therefore, we hold, he is entitled to counsel on appeal.

Because an indigent adult subject to the Act is entitled to counsel on appeal, it is evident to this court that the *Anders* no-merit procedures would best protect Mr. Adams's interests, or those of any indigent adult subject to the Act, when counsel believes there is no issue of arguable merit for appeal. Accordingly, we hold that the *Anders* no-merit procedures apply to appeals by indigent adults from long-term custody orders under the Adult Maltreatment Custody Act. In doing so, we further hold that appointed counsel for an indigent adult, subject to the Adult Maltreatment Custody Act, on a first appeal from an order of long-term custody may petition this court to withdraw as counsel if, after a conscientious review of the record, counsel can find no issue of arguable merit for appeal. Counsel's petition must be accompanied by a brief discussing any arguably meritorious issue for appeal. The indigent adult must be provided with a copy of the brief and notified of his or her right to file points for reversal within thirty days. If this court determines, after a full examination of the record, that the appeal is frivolous, the court may grant counsel's motion and dismiss the appeal. If, however, we find any of the legal points arguable on their merits, we will appoint new counsel to argue the appeal.

---

**3.** There is no question that an adult subject to the Act can appeal the order of the probate court, as Ark.Code Ann. § 28–1–116 (Repl. 2004) specifically permits an appeal of pro-

bate orders, except an order removing a fiduciary for failure to give a new bond or to render an account as required by the court or an order appointing a special administrator.

Because Mr. Adams's counsel has filed a no-merit *Anders* brief and a motion to withdraw in accordance with the procedures set forth above, we will consider the instant no-merit appeal.

## II. Order of Long–Term Custody

■ Mr. Adams's counsel next asserts that the probate court did not err in granting DHS's petition for custody. Stating that the case is one of first impression, counsel urges this court to adopt the same standard of review used in termination-of-parental-rights cases, that of clear and convincing evidence. He further contends that the evidence presented supports the circuit court's order of long-term custody.[4]

■ Our standard of review for probate orders is well established. This court reviews probate proceedings de novo, and the decision of the probate court will not be disturbed unless clearly erroneous, giving due regard to the opportunity and superior position of the probate court to determine the credibility of witnesses. *See Buchte v. State,* 337 Ark. 591, 990 S.W.2d 539 (1999) (reviewing an order of involuntary commitment). *See also Campbell v. State,* 51 Ark.App. 147, 912 S.W.2d 446 (1995) (observing, in review of an involuntary-commitment order, that when the burden of proof in the trial court was by clear and convincing evidence, the standard of review was whether the trial court's finding is clearly erroneous). After reviewing the evidence in the instant case, we cannot say that the circuit court clearly erred in granting the petition for long-term custody.

Pursuant to the Act, the probate court may order long-term custody with DHS if the court determines that:

(1) The adult lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents an imminent danger to his or her health or safety;

(2) The adult is unable to provide for his or her own protection from maltreatment; and

(3) The court finds clear and convincing evidence that the adult to be placed is in need of placement as provided in this chapter.

Ark.Code Ann. § 9–20–117(c) (Repl.2008). Here, the circuit court made the requisite findings. Thus, the question presented is whether the circuit court's findings were clearly erroneous. They were not.

A review of the hearing before the circuit court reveals the following testimony. Sunny Rutledge, an Adult Protective Services case worker, testified that on February 13, 2008, DHS was contacted and informed by a senior-care facility in Forrest City that Mr. Adams was ready to leave the facility, "and that they didn't believe that he was able to leave on his own." Ms. Rutledge stated that while Mr. Adams did not want to be discharged to a nursing home, the facility did not think him able to take care of himself, and, further, he had no family willing to take care of him. Ms. Rutledge testified that prior to that, Mr. Adams had been in a nursing home in Harrisburg, and that, upon leaving against medical advice, Mr. Adams went to Cross County, where he was incarcerated for writing hot checks.[5] She stated that while

---

4. As already noted, in compliance with the *Anders* no-merit procedures, Mr. Adams was notified of his right to file points for reversal. Mr. Adams did file some documents for our review, but no *actual* points for reversal were filed.

5. The hot-check charges stemmed from Mr. Adams's attempts to purchase both a truck and a house, using checks from accounts that had been closed for approximately two years.

in jail, Mr. Adams went off all of his medications, and upon being concerned when Mr. Adams's legs began to turn black, the jail sent Mr. Adams to the senior-care facility.

Ms. Rutledge testified that, while at the senior-care facility, Mr. Adams was evaluated by Dr. Jerry Pang. In a letter by Dr. Pang, which was submitted to the circuit court as an exhibit, he stated that

> [a]fter evaluating Mr. Adams, it is my opinion that Mr. Adams lacks capacity to fully comprehend the consequences of his behavior. Mr. Adams is an insulin dependent diabetic and also has coronary artery disease and hypertension. He requires close supervision to ensure that he takes medications as they are prescribed and that he receives proper nutrition for his diabetes. Furthermore, he lacks the capacity to manage financial matters as has already been demonstrated by his writing the checks with insufficient funds.

Ms. Rutledge further testified that Mr. Adams had admitted to having problems with his short-term memory, and that in an evaluation, also submitted to the circuit court, he was diagnosed with dementia.

Ms. Rutledge stated that, while in a Manila nursing home, Mr. Adams struck a nurse and was asked to leave. She said that no such problems had occurred at Mr. Adams's current facility, but that he had called her before the hearing, sounding delusional and stating that he did not want to go to court in Mississippi County because "his ex-wife was having sex with the Judge." Ms. Rutledge testified that some of the consequences posed to Mr. Adams by not taking his medications as needed were a very high risk of having another stroke and the possibility of losing his legs due to severe complications from his diabetes. Ms. Rutledge recommended that Mr. Adams remain in nursing-home care. She further testified that she did not feel that

he was able to protect himself from abuse or neglect; that if he was on his own, he did not have the capacity to understand that he was putting himself in a situation that would be putting him in imminent danger; that she believed that he should remain in his current facility and that it was the least restrictive alternative for him; and that his son and daughter would still be able to visit Mr. Adams at that facility.

Ms. Janice Woods, an Adult Protective Services nursing consultant and a registered nurse, testified that she had conducted a two-hour assessment of Mr. Adams's mental status and performed a mini-mental status examination. She stated that while he was aware of the type of medications that he was taking, she did not think he fully grasped the concept of what would happen if he did not take his medication. Specifically, she stated that upon not taking his medications for two months and being admitted to the hospital,

> his blood sugar was 264 and a normal value would be anywhere from 80 to 110 depending on the machine that you were using to calibrate it. His urine creatine level was 1.9, which with high blood sugars sometimes you can wind up with renal failure. He had a white count of 11.17 indicating that he had an infectious process going on. And his blood pressure was 173 over 83. He had a three plus pitting edema in his legs. They were very swollen and he also had cellulitis and was placed on antibiotics for that.

She commented that in those circumstances, renal failure, amputations due to the cellulitis, or another stroke due to heart dysrhythmias could result. She further related to the court the following:

> Anytime he's been out of the nursing home and even in the nursing home he's had either legal issues or issues with combative behavior. I believe one of the

nursing homes he struck a residen[t] there. At the Manila nursing home he argued with the nurse, according to the records, because he was insistent that he was not taking his furosemide, which is Lasix and when the nurse tried to explain it to him, he argued that he wasn't taking it and the nurse turned around to leave and he grabbed the nurse in a head-lock and started hitting the nurse in the back of the head multiple times. Finally, she testified that she believed that it was in Mr. Adams's best interest to remain where he was currently placed, and that based on her evaluations of him, she did not think that he had "the capacity to understand that he would be placed in a situation that might cause eminent danger to himself[.]"

Mr. Adams then testified in his own behalf and disputed the testimony of the prior witnesses. He testified that he did not try to write a check for a house and that he was going to borrow money from "the nursing home," who "had a plot" for him and "also a monument and it was eleven hundred and something dollars." He later clarified his statement, based on a certificate from Roller Funeral Home, saying that he believed the funeral home was going to give him money to cover his check. He further admitted that there were pending hot-check charges against him.

After reviewing the evidence before the circuit court, we cannot say that the circuit court clearly erred in awarding long-term custody of Mr. Adams to DHS. Accordingly, we affirm the circuit court's order. We further grant, pursuant to the *Anders* no-merit procedures adopted in this opinion, counsel's motion to withdraw.

Affirmed; Motion to withdraw granted.