

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-13-770

| | |
|---|---|
| JEAN DORAN<br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES<br>APPELLEE | **Opinion Delivered** September 24, 2014<br><br>APPEAL FROM THE SEBASTIAN<br>COUNTY CIRCUIT COURT, FORT<br>SMITH DISTRICT<br>[NO. PR-13-227]<br><br>HONORABLE JAMES COX, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the circuit court's order committing appellant to the protective custody of the Arkansas Department of Human Services (DHS). On appeal, appellant argues that the circuit court erred in finding (1) that the evidence presented clearly and convincingly established that appellant was in need of long-term placement in the custody of DHS and (2) that the least restrictive means of placement was institutional care. This case was previously before this court wherein we remanded for supplementation of both the record and the addendum.[1] Appellant has now cured the deficiencies, and we proceed to address the merits of her two points for reversal. We affirm.

On April 23, 2013, the Adult Protective Services hotline received a referral on appellant alleging that appellant was blind, paranoid regarding having surgery to have cataracts removed, unable to get to the grocery store or prepare food, had no

---

[1]*Doran v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 238.

SLIP OPINION

transportation, and could not bathe. Visits to appellant were attempted by Louise Spaunhurst[2] on the following two days, but appellant would not come to the door and yelled for Spaunhurst to go away on both visits. Despite being unable to enter the home, Spaunhurst was able to speak with appellant on the phone. A seventy-two-hour hold was taken on appellant on April 25, 2013; however, appellant refused to leave her home.

On April 26, 2013, DHS filed a petition for emergency custody of appellant pursuant to the Adult Maltreatment Custody Act (AMCA). [3] In the petition, DHS argued that appellant's circumstances and conditions were such that returning to or continuing at the appellant's place of residence or in the care and custody of a parent, guardian, or other person responsible for appellant's care presents imminent danger to appellant's health or safety. It also argued that appellant lacked the capacity to comprehend the nature and consequences of remaining in a situation that presents imminent danger to her health or safety and that appellant had mental and physical impairments that prevented her from protecting herself from imminent danger to her health or safety. DHS specifically requested that law enforcement and appropriate medical personnel be directed to assist DHS in obtaining custody of appellant.

An ex parte order for emergency custody was entered on April 26, 2013, finding probable cause to believe that grounds existed to take emergency custody, as alleged by DHS. In support of its probable cause finding, the court cited the affidavit of Spaunhurst,

---

[2]Spaunhurst is a registered nurse with DHS's Adult Protective Services.

[3]Ark. Code Ann. §§ 9–20–101 to 121 (Repl. 2009). Alternatively, DHS argued pursuant to the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act, Ark. Code Ann. §§ 28–74–101 to 505 (Repl. 2012).

noting, among other things, that appellant suffered from "blindness, frontal lobe dementia, reasoning impairment, left ventricular hypertrophy, paranoia, and congestive heart failure." The court referenced "statements from five of the [appellant's] physicians that the [appellant] is unsafe to be on her own and cannot make decisions for herself." The court also noted appellant's deterioration since December 2012; non-compliance with medicine prescriptions; refusal to allow any home medical care providers to enter her home or provide care or assistance; and lack of a known caregiver currently responsible for her protection, care, or custody. Finding "it necessary to place the [appellant] in the emergency custody of Adult Protective Services in order to protect the [appellant's] health and safety," the court awarded DHS emergency custody of appellant. A probable cause order was entered on May 13, 2013.

A long-term custody hearing was held on June 3, 2013, and an amended order for long term protective custody was entered on July 10, 2013. Therein, the court awarded long-term custody of appellant to DHS, specifically relying on DHS's court report; the affidavit of Robert Baker, D.O.; the affidavit of Margaret Tremwel, M.D.; the testimony of Louise Spaunhurst, R.N.; and the testimony of Dr. Tremwel. This timely appeal followed.

Our standard of review for probate orders is well established. This court reviews probate proceedings de novo, and the decision of the probate court will not be disturbed

3



unless clearly erroneous, giving due regard to the opportunity and superior position of the probate court to determine the credibility of witnesses.[4]

## I.    Insufficient Evidence

Pursuant to the AMCA, the probate court may order long-term custody with DHS if the court determines that:

(1) The adult lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents an imminent danger to his or her health or safety;

(2) The adult is unable to provide for his or her own protection from maltreatment; and

(3) The court finds clear and convincing evidence that the adult to be placed is in need of placement as provided in this chapter.[5]

The court made the required findings; therefore, we need only address whether these findings were clearly erroneous as appellant asserts.

Adult maltreatment, as defined by the Act, includes abuse, exploitation, neglect, physical abuse, or sexual abuse of an adult.[6] Appellant accurately argues that no evidence was presented that appellant had been abused, sexually or physically, and there was no evidence of exploitation. However, appellant ignores neglect as a form of adult

---

[4]*Adams v. Ark. Dep't of Human Servs.*, 375 Ark. 402, 409, 291 S.W.3d 172, 177 (2009) (citing *Buchte v. State*, 337 Ark. 591, 990 S.W.2d 539 (1999) and *Campbell v. State*, 51 Ark. App. 147, 912 S.W.2d 446 (1995)).

[5]*Id.*, 375 Ark. at 409–10, 291 S.W.3d at 177 (citing Ark. Code Ann. § 9-20-117(c) (Repl. 2008)).

[6]Ark. Code Ann. § 9-20-103(2) (Supp. 2013).

SLIP OPINION

maltreatment. Neglect, as defined by the act, includes an act or omission by an endangered or an impaired adult such as self-neglect.[7]

At the long-term custody hearing, DHS called four witnesses; appellant called two witnesses including herself. Dr. Margaret Tremwel testified regarding two encounters she had with appellant. During the first encounter, occurring "towards the end of 2012," Dr. Tremwel diagnosed appellant with "dementia of the frontal lobe type."[8] She explained that the frontal lobe deals with "the ability to make a decision, to take a complex problem from beginning to completion;" opined that frontal lobe dementia is "more a problem with judgment;" and asserted that appellant's major problem, for which Dr. Tremwel was consulted, was her health and her ability to manage her healthcare. Dr. Tremwel testified that she came into contact with appellant again in April 2013 when appellant returned to the hospital and was admitted to Sparks Senior Care due to "difficulty caring for herself at home." Dr. Tremwel detailed appellant's various refusals of cataract surgery to correct her blindness, which was due at least in part, to cataracts; and noted instances of appellant's inability to independently complete her personal care tasks. Dr. Tremwel asserted that she believed that appellant was "at risk or in danger of self-neglect or something else if she were to be returned home without care or supervision."

Spaunhurst testified regarding her contact with appellant beginning with her first visit to appellant after receiving the hotline report on April 24, 2013, and ending with

---

[7]Ark. Code Ann. § 9-20-103(17).

[8]Dr. Tremwel came into contact with appellant on a hospital consult regarding concerns that appellant suffered from dementia.



appellant being placed in emergency custody on April 26, 2013. Spaunhurst described

appellant as "appear[ing] to be disoriented" during those contacts and "could not answer

questions." Spaunhurst also detailed appellant's interactions with various service providers

as reported to her by the service providers when she contacted them:

(1) Tina Shores at Blind Services[9] stated that it had "attempted for quite some time to assist Ms. Doran in her home . . . but she had refused all of those services,"[10] and that it had sent Jimmy Jones to appellant's home to try to provide assistance;" [11]

(2) Elder Choice Services sent a nurse, Lynn Hubbard, to appellant's home, "but [appellant] refused to sign their consent form;"

(3) Pam Langston at Amedisys Home Health advised that it sent someone out to see appellant at her home "several times" but appellant "refused services as far back as February;"[12]

(4) Langston also noted that she had made "a couple of home visits with Mrs. Doran restricting their abilities to provide care," and refusing occupational therapy and social worker services; and

(5) Visiting Angels, a private pay organization, had been contacted by appellant, but she limited the aide's abilities during his three visits with her.

Spaunhurst also described appellant's home as "quite messy" to the point of posing "a

challenge [to appellant] to maneuver herself throughout her home;" detailed finding

---

[9]Though referred to by Spaunhurst and other witnesses as "Blind Services" it appears from the record that the name was actually Division of Services for the Blind; it is a department under DHS.

[10]Spaunhurst would later testify that Blind Services had been attempting to assist appellant for "over a year and a half."

[11]According to later testimony from Jimmy Jones, appellant was never actually a client because she would not consent for their care.

[12]Appellant requested assistance from Amedisys in April 2013 after refusing services as recently as February 2013.

unused medicine in various places throughout the home; and identified appellant's financial assets and liabilities which included utility bills that had "a couple of months accrued."

Jimmy Jones, a rehabilitation teacher with Services for the Blind, testified that his initial contact with appellant occurred in "late spring, just early summer" 2011 and was for eye problems which he remedied by giving appellant a magnifier.[13] He testified that appellant contacted him in the fall of 2011 because the initial magnifier was not working as well; he gave her a stronger magnifier. Appellant contacted him again in 2012 because she "was having a lot more vision problems" so that the magnifying glass "didn't work that well." In the fall of 2012, after Services for the Blind obtained some independent living money, Jones notified appellant who did not want to sign up for services because she thought she was already signed up for services.[14] Jones testified to his belief that appellant's vision "really went down pretty quick" around Thanksgiving 2012 due to appellant calling 911 to have herself transported to the hospital because she was blind.

Jones testified that during appellant's stay in the hospital following the 911 call, she requested that he come visit, which he did, but that they did not get anywhere because "the conversation just kind of went around in circles" regarding what services she could receive and the need for her to sign up for these services via application, which appellant denied needing to do because of her erroneous belief that she was already signed up. He

---

[13]Appellant needed the magnifying glass to read.

[14]Jones asserted that no case was, or could be, opened on appellant prior to this time because Services for the Blind had lost the grant that would have paid for the services appellant needed.



eventually testified that he did not believe "based on [his] interaction with [appellant] over the last two years that she is able to take care of herself without assistance." Though he testified that he thought appellant was "sharp" mentally, he asserted that her issue was with "following through to get things done."

Melissa Herring, a certified nursing assistant with Visiting Angels, testified that during March and April 2013, she assisted appellant on three occasions with daily living tasks, like cleaning the house or doing laundry, but that appellant would not permit Herring to help with appellant's personal care, like bathing.[15] However, Herring testified to having other concerns with appellant including her ability to get "lost very easily."

Pamela Langston, a registered nurse with Amedisys Home Health, testified to her interaction with appellant since March 2013 and appellant's unwillingness to receive services. She noted that appellant will "agree to services but then resist when we actually [try] to put them in place" and was "paranoid of anybody being around her." Based on her interactions with appellant, she testified that she did not believe appellant was able to take care of herself without assistance.

In addition to testimony before the court, which included appellant's own testimony that she could not make her own bed alone, there was photographic evidence showing appellant's home covered in clutter and a missing section of the ceiling.

In the face of this evidence, it is clear that appellant was neglecting herself. Accordingly, the court made the necessary findings that appellant lacked the capacity to

---

[15]Herring testified that she had no reason to believe appellant was not taking care of her hygiene.

comprehend the nature and consequences of remaining in a situation that presents an imminent danger to her health or safety and was unable to provide for her own protection from maltreatment, specifically including self-neglect, due to her mental and physical ailments.

In support of her argument, appellant cites her own testimony often as it often contradicted the testimony of the service providers. Disputed facts and determinations of witness credibility are within the province of the fact-finder.[16] It is our duty to reverse if our own review of the record is in marked disagreement with the circuit court's findings.[17] After reviewing the evidence in the instant case, we cannot say that the circuit court clearly erred in granting DHS's petition for long-term custody.

## II.    Least Restrictive Environment

Appellant argues alternatively that if the court's finding that appellant was in need of long-term protective custody, the court erred in failing to determine whether institutional care was the least restrictive method for appellant's protection. This argument was not raised below. It is well established that failure to raise an issue before the trial court is fatal to an appellate court's consideration on appeal.[18]

Affirmed.
GLADWIN, C.J., and WOOD, J., agree.
*Robert M. "Robby" Golden*, for appellant.
*Tabitha B. McNulty*, Arkansas Department of Human Services, for appellee.

---

[16]*Acuna v. Watkins*, 2012 Ark. App. 564, at 7, ___ S.W.3d ___ (citing *Ridenoure v. Ball*, 2011 Ark. App. 63, 381 S.W.3d 101).

[17]*Id.*

[18]*Hall v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 245, at 10, 413 S.W.3d 542, 548 (citing *Lauman v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 564).

SLIP OPINION