# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-594

| | |
|---|---|
| BETTY NICHOLSON<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES<br><br>APPELLEE | **Opinion Delivered:** February 1, 2017<br><br>APPEAL FROM THE SEBASTIAN<br>COUNTY CIRCUIT COURT,<br>FORT SMITH DISTRICT<br>[NO. 66PR-2016-169]<br><br>HONORABLE ANNIE POWELL<br>HENDRICKS, JUDGE<br><br>AFFIRMED |

**BART F. VIRDEN, Judge**

The Sebastian County Circuit Court entered an order for long-term protective custody of appellant Betty Nicholson. On appeal, Nicholson argues that (1) her family members were not sufficiently notified of the hearing, and (2) the trial court erred by limiting counsel's cross-examination regarding her assets and finances. We affirm.

I.      *Adult Maltreatment Custody Act*[1]

A maltreated adult is one who has been abused, exploited, neglected, physically abused, or sexually abused. Ark. Code Ann. § 9-20-103(15). "Neglect" includes self-neglect or an act or omission by a caregiver responsible for the care and supervision of an endangered or an impaired adult constituting negligent failure to, for example, provide necessary treatment, rehabilitation, care, food, clothing, shelter, supervision, or medical services to an

---

[1]Codified at Ark. Code Ann. §§ 9-20-101 et seq. (Repl. 2015).

endangered or an impaired adult, or to carry out a prescribed treatment plan.[2] *See* Ark. Code Ann. § 9-20-103(17)(A) & (B)(i), (iii).

The Arkansas Department of Human Services (DHS) may take a maltreated adult into emergency custody if the circumstances or condition of the maltreated adult are such that returning to or continuing at the maltreated adult's place of residence or in the care or custody of a person responsible for the maltreated adult's care presents imminent danger to the maltreated adult's health or safety, and the maltreated adult either lacks the capacity to comprehend the nature and consequences of remaining in such a situation, or has a mental or physical impairment that prevents the maltreated adult from protecting himself or herself from imminent danger to his or her health or safety. Ark. Code Ann. § 9-20-114(a)(1), (2).

Pursuant to Ark. Code Ann. § 9-20-117(c), the trial court may order long-term custody with DHS if the court determines that

(1) The adult has a mental or physical impairment or lacks the capacity to comprehend the nature and consequences of remaining in a situation that presents an imminent danger to his or her health or safety;

(2) The adult is unable to provide for his or her own protection from maltreatment; and

(3) The court finds clear and convincing evidence that the adult to be placed is in need of placement as provided in this chapter.

II.     *Procedural History*

In March 2016, DHS petitioned for emergency custody of Nicholson. In an affidavit attached to the petition, Louise Spaunhurst, a registered nurse for Adult Protective Services

---

[2]*See* Ark. Code Ann. § 9-20-103(6)(A) & (10)(A), respectively, for the definitions of an "endangered adult" and an "impaired adult."

(APS), attested that she had investigated allegations of caregiver neglect on two occasions concerning Nicholson. In the affidavit, Spaunhurst listed Nicholson's family as a husband and six adult children, only one of whom lived nearby, and indicated that Nicholson had limited financial means. The affidavit of Dr. Fayz Hudefi was also introduced. He diagnosed mild neurocognitive disorder consistent with Alzheimer's dementia, and he recommended institutional care for Nicholson, opining that she required "24/7 assistance."

The trial court entered an ex parte order for emergency custody, directed DHS to place Nicholson in the least restrictive environment necessary to meet her needs, scheduled a probable-cause hearing, and assigned an attorney to represent Nicholson. Following a hearing, the trial court found that there was probable cause to issue the emergency order, that probable cause continued to exist, and that Nicholson would remain in DHS's protective custody until a long-term custody hearing could be held.

III.    *Custody Hearing*

A hearing for long-term custody was held in April 2016. Spaunhurst testified that APS had received a hotline call concerning Nicholson in early December 2015 while she was staying at a motel with her husband Johnnie. It was alleged that Nicholson weighed only ninety pounds and had no food. According to Spaunhurst, Nicholson had said that she was getting plenty to eat and that her weight was normal for her. Spaunhurst stated that Nicholson's room at the motel had a small refrigerator containing "a little bit of food" and that Nicholson and her husband had said they went to the rescue mission for food and were aware of the local food bank. Spaunhurst visited with Nicholson at the motel and learned that her room had been paid through the month of December. It was also reported through

the hotline that "the alleged offender" was abusive, had sold Nicholson's medications, and had given her alcohol and cigarettes. Nicholson denied any physical abuse and claimed that she was happy. Johnnie reported that Nicholson took no medications—just vitamins. He also reported that Nicholson had memory problems but had assured Spaunhurst that he stayed with Nicholson.

Spaunhurst testified that in March 2016, she had been notified that Nicholson had wandered from the motel and had been found near the Savoy Tea Company. It was reported that Nicholson had been confused, could not say where she lived, and had not known how she had gotten to where she had been found. Nicholson was able to provide police with her son's name. He had been contacted, and he had cared for his mother over the weekend. According to Spaunhurst, the son had contacted her and said that Nicholson required more care than he and his wife could provide. Spaunhurst said that DHS then placed a seventy-two-hour hold on Nicholson.

Spaunhurst further testified that Nicholson had been evaluated by Dr. Philip Elangwe, whose affidavit was introduced at the hearing. The affidavit indicated that Dr. Elangwe had diagnosed dementia and COPD with a secondary diagnosis of psychosis. He attested that Nicholson required twenty-four-hour monitoring in a secure and structured environment. Dr. Elangwe opined that Nicholson was mentally and physically impaired and did not have the mental capacity to protect herself from abuse, neglect, or exploitation. He recommended institutional care for Nicholson.

Spaunhurst testified that Johnnie was staying at the rescue mission after a two-week stint in the detention center. She said that she had been in contact with Nicholson's other

family members but that none of them were able to care for her. According to Spaunhurst, Nicholson received $654 per month in Social Security benefits and $90 per month in SSI benefits from Nebraska. Spaunhurst said that Nicholson also had a bank account at Metro Credit Union in Omaha, Nebraska, with a current balance of approximately $500. Nicholson had outstanding loans totaling approximately $1,400. Spaunhurst stated that she had completed a Medicaid Long-Term Care application, which could pay for Nicholson's care at a facility and allow her some money for personal spending. Spaunhurst testified that Nicholson had no other assets. This question by Nicholson's counsel prompted an objection from DHS counsel as "outside the scope of . . .," and the trial court sustained the objection before counsel could finish her sentence. Nicholson's counsel then asked whether the court's ruling precluded her from cross-examining the witness on statements made about Nicholson's finances. The court said, "Well, I think we've already covered it, so I don't know what else you'd have to ask." Nicholson's counsel said, "I have to do it in every case, so I'm just asking . . ." and moved on. Spaunhurst testified that Nicholson was at Sparks Senior Care and that it was the physician, and not she, who recommended and found placements for clients.

Nicholson testified that she liked to live on her own and would like to get her own place eventually. She said, "I am feeling okay now. They treat you good there and it's, you know, I get to go smoke and—it's not confined-like. It's not a bad place, really. I don't know of anything I need. Except money and a place to live."

In its order following the hearing, the trial court found that Nicholson was endangered or impaired and lacked the capacity to comprehend the nature and

consequences of remaining in a situation that presented an imminent danger to her health or safety. The trial court found that Nicholson had been diagnosed with dementia and COPD, with a secondary diagnosis of psychosis, and was not able to take care of herself or protect herself from abuse, exploitation, or other maltreatment, including self-neglect. The trial court noted that Dr. Elangwe had recommended twenty-four-hour monitoring in a secure and structured environment. The trial court further found that there was no known caregiver currently responsible for Nicholson's care who was willing or able to provide her with the level of professional nursing care and supervision that she required. The trial court found by clear and convincing evidence that Nicholson was in need of placement and that DHS should retain long-term custody of her. DHS was ordered to place Nicholson at an appropriate facility in the least restrictive environment that best met her needs.

## IV.  *Standard of Review*

The standard of review for probate orders is well established. The appellate court reviews probate proceedings de novo, and the decision of the probate court will not be disturbed unless clearly erroneous, giving due regard to the opportunity and superior position of the probate court to determine the credibility of witnesses. *Adams v. Ark. Dep't of Human Servs.*, 375 Ark. 402, 291 S.W.3d 172 (2009).

## V.  *Discussion*

### A.  Failure to Notify Family

Arkansas Code Annotated section 9-20-111(d)(2) provides that "notice of the long-term custody hearing *shall* be given to the next of kin of the respondent whose names and addresses are known to the petitioner." (Emphasis added.) Nicholson argues that DHS

presented no evidence that her family members had been notified as required and, therefore, DHS did not prove that there was no caregiver who was willing and able to provide her with the care she required. Nicholson makes an alternative argument that there was no indication that her family members had been unable to assist in collecting entitlements to provide the care she required.

Spaunhurst testified that she had been "in touch with" and had spoken with Nicholson's family members and that no one was able to provide the care Nicholson required; however, Spaunhurst did not testify that she had notified those family members of the custody hearing so they could be questioned regarding what they were willing to do. While we may agree that there was no evidence of notification as required by section 9-20-111(d)(2), Nicholson did not raise this procedural point below. It is thus not preserved for review on appeal. *Doran v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 505, 442 S.W.3d 868. Moreover, we note that the statute does not specify what type of notice is required.

Nicholson further asserts as part of her notification argument that Spaunhurst's testimony that her son and daughter-in-law had said that they could not provide the care she needed was clearly hearsay. She also states that Spaunhurst's testimony that Nicholson's husband was at a rescue mission after serving two weeks in jail was also hearsay and that no foundation had been laid for such testimony. Nicholson acknowledges that she did not raise proper objections at the hearing and recognizes that these arguments are not preserved. *Doran*, *supra*.

### B. Limiting Cross-Examination

Next, Nicholson argues that the trial court clearly erred by agreeing with DHS to limit counsel in inquiring into assets or available benefits and to prohibit additional questions on the subject on cross-examination. Nicholson states that "[m]aybe the information would not have been more helpful," but to place such limitations on counsel was a denial of due process. Nicholson points to section 9-20-111(4), which provides that the respondent has a right to cross-examine witnesses who testify against her. We acknowledge such right; however, Ark. Code Ann. § 9-20-108 provides,

> If the maltreated adult is found to be indigent and the court appoints the Arkansas Public Defender Commission as counsel for the maltreated adult, the commission shall represent the maltreated adult *as to the issue of deprivation of liberty*, *but not with respect to issues involving property, money, investments, or other fiscal issues*.

(Emphasis added.)

Nicholson argues that it makes no sense that she cannot inquire into the assets of a maltreated adult if counsel has been appointed to protect her liberty interest by advocating for placement other than in an institution. We tend to agree; however, Nicholson did not raise this particular statutory-interpretation argument below so that the trial court would have had an opportunity to rule on it. Therefore, it is not preserved for review. *Doran, supra.* We note that Nicholson's finances were discussed in detail; thus, we do not see how Nicholson could demonstrate prejudice. Finally, counsel made no due-process argument below, so that aspect of her argument was not preserved. *Doran, supra.*

VI.    *Conclusion*

Nicholson does not dispute that she is in need of care, and the trial court made the requisite findings. We cannot say that the trial court clearly erred in placing Nicholson in the long-term protective custody of DHS.

Affirmed.

HIXSON, J., agrees.

VAUGHT, J., concurs.

*Dusti Standridge*, for appellant.

*Mary Goff*, Office of Chief Counsel, for appellee.