2012 Ark. App. 245

**Roger HALL, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor child, Appellees.**

No. CA 11–1220.

Court of Appeals of Arkansas.

April 11, 2012.

Janet Lawrence, Conway, for Appellant.

Tabitha Baertels McNulty, Little Rock, Melissa Richardson, Jonesboro, for Appellees.

JOHN B. ROBBINS, Judge.

Appellant Roger Hall appeals from the termination of his parental rights to his son, R.H., who was born on June 2, 2001.[1] On appeal, Mr. Hall raises one point arguing that there was insufficient evidence that termination of his parental rights was in the best interest of the child. We affirm.

We review termination of parental rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding

---

1. The child's mother's parental rights were also terminated, but the mother is not a party to this appeal.

that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark.Code Ann. § 9–27–341 (Supp.2011); *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark.App. 302, 952 S.W.2d 177 (1997). Clear and convincing evidence is that degree of proof that will produce in the factfinder a firm conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997).

This case began when appellee Arkansas Department of Human Services (DHS) took emergency custody of R.H. on November 10, 2009. At that time R.H. was living in Fort Smith with his mother, Teresa Hall. Roger Hall was living in California with his parents, where he continues to reside. R.H. was taken into DHS custody after Ms. Hall's house was raided by the police. During the raid, the police discovered a large quantity of methamphetamine, various pills, several guns and knives, and pornography, all of which were within sight and reach of the child. Ms. Hall was subsequently charged with numerous felonies including possession of methamphetamine with intent to deliver and maintaining a premises for the purpose of drug sales. The trial court entered an emergency order for DHS custody on November 12, 2009, and the child has remained in DHS custody since then.

On November 20, 2009, the trial court entered a probable-cause order finding probable cause that the emergency conditions that necessitated removal of the child from his mother's custody continued. An adjudication hearing was held, and on January 25, 2010, the trial court entered an order adjudicating R.H. dependent-neglected. The trial court set reunification as the goal of the case and ordered Mr. Hall to maintain stable and appropriate housing, employment, income, and transportation. Ms. Hall was also given these requirements, as well as additional orders including drug testing and resolving her outstanding criminal charges.

A review order was entered on November 10, 2010, wherein the trial court stated that the goal of the case continued to be reunification with the concurrent plan of termination of parental rights. In that order, the trial court noted that Ms. Hall had not complied with the case plan because she had not resolved her criminal charges and lacked stable housing, employment, income, or transportation. As for Mr. Hall, the trial court noted that the California human services agency denied his home study in part because he resided with his father, who has a criminal history. The trial court indicated that DHS arranged a visit with R.H. when Mr. Hall came to Arkansas for the review hearing, and the trial court permitted future telephone visits twice a week.

DHS filed a petition to terminate both parents' parental rights on February 8, 2011. On February 11, 2011, the trial court entered a permanency-planning order changing the goal of the case to termination of parental rights and adoption. In the permanency-planning order, the trial court found that Ms. Hall was in noncompliance with much of the case plan. The trial court further found that Mr. Hall had not complied with the orders of the court because his home study was denied and he had not made any changes in his living arrangement since the denial. The trial court also found that the telephone visits had often been inappropriate. The trial court scheduled a termination hearing.

After the termination hearing, the trial court entered an order on September 20, 2011, terminating the parental rights of both parents. In the termination order, the trial court found by clear and convincing evidence that termination was in R.H.'s best interest. The trial court specifically considered the likelihood that R.H. would be adopted and the potential harm of returning him to the custody of his parents as required by Ark.Code Ann. § 9–27–341(b)(3)(A) (Supp.2011). The trial court found that it would present a risk of harm to R.H. if he were placed with his father because Mr. Hall's home study was denied as a result of there being a convicted felon in the home. The trial court further found that Mr. Hall lacked stable and appropriate housing, employment, or income, that his only participation in the case was sporadic, and that at times he had inappropriate phone contact with the child. The trial court also found that the risk of psychological damage existed if returned to a parent partially due to the special needs of R.H., who is autistic. The trial court found clear and convincing evidence of the following three statutory grounds under Ark.Code Ann. § 9–27–341(b)(3)(B):

(i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

. . . .

(ix)(a) The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:

(3)(A) Have subjected any juvenile to aggravated circumstances.

(B) "Aggravated circumstances" means:

(i) [T]here is little likelihood that services to the family will result in successful reunification[.]

At the termination hearing, Mr. Hall testified that he has lived with his parents in Dos Palos, California for the past two years. He stated that he moved in with them to help take care of his aging father, who is disabled and in a wheelchair. Mr. Hall testified that his only employment is doing sporadic yard work for the elderly, for which he earns about $300 per month. He stated that he moved to California to find a job as an electrician, but that no jobs were available. Mr. Hall anticipated getting a better job soon, stating that he is involved with a program called Worknet that provides training and job placement to veterans such as himself. As for transportation, Mr. Hall indicated that he rides a bicycle to get around town and that his parents have a car and a truck.

Mr. Hall testified that he had lived in the same household with his son until a little more than two years ago when he separated from Ms. Hall and left R.H. in her custody. Mr. Hall stated that they had lived in Colorado during R.H.'s early childhood, as well as in Arkansas for a four-year period. Mr. Hall stated that R.H. was diagnosed with autism when he

was about four years old, but he maintained that he understands R.H.'s medical condition and has no problem caring for him.

As far as his current living arrangement, Mr. Hall acknowledged that he had been informed that placement of R.H. in his current residence was unsuitable due to his father's prior conviction for domestic abuse. However, he testified that he is in the process of trying to get a caretaker for his father so he can move out of the house. Mr. Hall stated that he plans to move in with his sister, who lives in the same town across the street from where R.H. could attend school. Mr. Hall indicated that he and R.H. would share a bedroom, and that his sister has volunteered to babysit R.H. when he was at work. Mr. Hall stated that he wanted R.H. to be with him.

Cathy Brown has been R.H.'s foster parent for a little more than a year. She testified that R.H. is very intelligent, but that he has a lot of trouble with social interaction as well as anxiety when faced with complex tasks. R.H. is enrolled in special education classes, and also sees a psychologist and receives counseling. Ms. Brown indicated that since being in her custody R.H. has become more relaxed and shown improvement in school. Ms. Brown testified that she wants what is best for R.H., and that in the event the trial court ordered termination she wanted to be considered as an adoptive parent.

Ms. Brown testified that she supervised the scheduled telephone calls between Mr. Hall and R.H., and that on fourteen occasions Mr. Hall was not present when she called. On those occasions R.H. would usually speak with his grandmother. Ms. Brown indicated that Mr. Hall did answer most of the calls, but that at times the communications upset R.H. During one particular phone call, R.H. was reportedly told about a funeral where his father carried a dead body without a head, arms, or legs. Ms. Brown stated that R.H. was very troubled by that conversation and had a nightmare that night. On numerous other occasions, Mr. Hall would try to teach R.H. to sing songs over the phone, and R.H. would become agitated resulting in Mr. Hall harshly raising his voice and insisting that R.H. sing the song. When this happened, R.H. would become uncomfortable and say that he was tired and end the call.

R.H.'s paternal grandmother Betty Hall, who is a retired nurse, also testified. She stated that her husband committed domestic battery against her seventeen years ago when he had been drinking at a party at their house. She did not deny that this resulted in a felony conviction. According to Mrs. Hall, her husband pushed her and she called the police, and he later pleaded guilty and satisfied his sentencing requirements. However, she said that she was not injured during that incident, that her husband has not drunk for more than fifteen years, and that he is an honorable man. Mrs. Hall stated that her home would be a safe place for R.H., and that he could have his own room. She further testified that her son, Mr. Hall, is a good father and that it would be beneficial to R.H. if he were returned to him. Mrs. Hall indicated that R.H. has numerous relatives who live near her home in California. On cross-examination, Mrs. Hall acknowledged that the reason her son lives with her is because he does not have a job and cannot afford an apartment.

Mr. Hall's sister, Betty Smith, testified that she has offered to let Mr. Hall and R.H. move into her home. She lives in a four-bedroom house with her husband and son, and she anticipates getting custody of her grandson soon. Mrs. Smith said that her home would be an appropriate place-

ment for R.H., and that R.H. and Mr. Hall could stay in the same room.

In this appeal, Mr. Hall argues that the trial court erred in terminating his parental rights because there was insufficient evidence that termination was in the child's best interest. He takes issue with the denial of the home study based on his father's seventeen-year-old conviction for domestic abuse, arguing that this was an isolated incident; that his father is elderly and confined to a wheelchair, and that his father is not and has never been a threat to R.H. Mr. Hall submits that the trial court should have considered all of the circumstances instead of a single incident that occurred seventeen years ago. He argues that his present living arrangement would allow R.H. his own room and would be a suitable environment, with the support of extended family. Mr. Hall posits that his mother is a retired nurse and could help with the special needs presented by R.H.'s autism. He acknowledges that he does not currently have stable income, but asserts that he proved that there is a high likelihood that he will have stable employment and income within a very short time. Mr. Hall argues that it is in R.H.'s best interest to keep the family intact, and that the order terminating parental rights should be reversed.

We hold that the trial court did not clearly err in finding that termination of Mr. Hall's parental rights was in R.H.'s best interest. After R.H. was removed from his mother's home, Mr. Hall was only ordered to obtain and maintain stable and appropriate housing, employment, income, and transportation. At the time of the termination hearing Mr. Hall was in noncompliance with these requirements. Even if we agreed with Mr. Hall that the presence of his father in the home should

not render his home unsuitable for R.H., the evidence clearly showed that Mr. Hall lacked stability. Mr. Hall's mother testified that Mr. Hall was staying with them because he did not have a job, and that she was the person who drove her husband to his medical appointments. Mr. Hall testified that he only worked sporadically doing yard work and making about $300 per month, and he never had a stable job or income during the entire pendency of this case. He further stated that he used a bicycle for transportation.

In addition to Mr. Hall's failure to demonstrate stability, there was evidence that his telephone visits with R.H. were sometimes missed and often inappropriate. According to R.H.'s foster mother, Ms. Brown, some of their conversations would upset R.H. and result in adverse reactions. She said that after DHS discontinued the telephone visitation, R.H. became less agitated, more relaxed, and more interactive with others. There are significant special needs of this autistic juvenile, and R.H. has progressed well while in Ms. Brown's care. Ms. Brown expressed an interest in adopting R.H., which would achieve the objective of permanency. On this record we cannot say that the trial court erred in terminating Mr. Hall's parental rights when considering the best interest of the child.

Although not listed as a separate point on appeal, we recognize that included in Mr. Hall's one-point brief is a cursory argument wherein he asserts that DHS had an obligation to investigate the potential Indian heritage of R.H. and follow the proper procedure of notifying the tribes of the situation.[2] He cites the Indian Child Welfare Act of 1978 (ICWA), codified at 25 U.S.C. §§ 1901–1963. The ICWA estab-

---

2. Arkansas Supreme Court Rule 4–2(a)(3) admonishes that the appellant shall *list and sep-* *arately number* the points relied upon for a reversal of the judgment. (Emphasis added.)

lishes minimum federal standards for the removal of Indian children from their families and the placement of Indian children into foster or adoptive homes. Notice to an Indian tribe of an involuntary proceeding is required when a juvenile court knows or has reason to know that an Indian child is involved. 25 U.S.C. § 1912(a). The ICWA also provides that a court cannot terminate parental rights to an Indian child unless there is evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. *See* 25 U.S.C. § 1912(f).

It is well established that failure to raise an issue before the trial court is fatal to an appellate court's consideration on appeal. *Lauman v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 564, 2010 WL 3422459. The record in this case contains no indication that the issue of ICWA compliance was ever raised by Mr. Hall, and thus this issue is not preserved. Moreover, even had Mr. Hall raised an ICWA challenge below, the argument would be without merit. ICWA applies only to an "Indian child," which is defined as any unmarried person under the age of eighteen who is either (a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and is the biological child of the member of an Indian tribe. 25 U.S.C. § 1903(4). The only mention of R.H.'s possible Indian heritage in the entire record was in the DHS employee's affidavit in support of emergency custody, wherein it was asserted that the child's mother reported that the child's grandmother was a registered member of the Blackfoot and Cherokee Nations. Even if this is true, this would fail to qualify R.H. as an Indian child under the definition given by the ICWA.

Finally, we note that in addition to arguing that termination was not in R.H.'s best interest, Mr. Hall offers the single-sentence argument, "[t]he statutory requirements were not met, and the evidence presented at the termination hearing established that the child could be returned to appellant at that time." However, appellant's challenge to the statutory requirements is developed no further, and failure to develop an argument precludes review on appeal. *See Davis v. State*, 375 Ark. 368, 291 S.W.3d 164 (2009). Moreover, a mere conclusory statement without convincing argument or authority is not effective to raise a point on appeal. *See Ball v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 307, 2011 WL 1573103. And even were we to consider the argument properly raised and developed, under the circumstances presented in this case the trial court did not clearly err in determining that the return of the juvenile to the parent was contrary to the juvenile's welfare and that, despite the offer of appropriate family services, Mr. Hall manifested the incapacity or indifference to rehabilitate his circumstances that prevent the return of the juvenile to his custody. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(a) (Supp.2011).

Affirmed.

VAUGHT, C.J., agrees.

HART, J., concurs.

HART, J., concurring.

I concur because, in affirming, we are following the law as created by the court of appeals just a few short months ago in *Glover v. Arkansas Department of Human Services*, 2011 Ark. App. 748, 387 S.W.3d 224. However, I believe that the *Glover* case was wrongly decided for the reasons that I set out in my lengthy dissent in that case.

Here, we have yet another nonoffending parent living out of state who was unable to surmount the barriers that ADHS placed in his way in order to gain custody of his biological $\lfloor_{12}$child. To Mr. Hall's credit, he was trying to step up and take care of his child. The people of Arkansas should expect nothing less.