

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-14-1017

| | | |
|---|---|---|
| SANDY SHARP | | **Opinion Delivered** November 18, 2015 |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. PR-2013-652-4] |
| V. | | |
| | | HONORABLE JOHN R. SCOTT, JUDGE |
| ANGELA PIKE | | |
| | APPELLEE | AFFIRMED |

## LARRY D. VAUGHT, Judge

Appellant Sandy Sharp appeals the decree of adoption entered by the Circuit Court of Benton County. On appeal, Sandy argues that the decree must be reversed because the trial court failed to consider notice along with remedial and rehabilitative requirements mandated by the Indian Child Welfare Act (ICWA). Sandy also contends that the trial court clearly erred in finding that her consent, pursuant to Arkansas Code Annotated section 9-9-207(a)(2), was not required. We affirm.

Sandy Sharp and Eric Pike, who were never married to each other, are the parents of K.P. (DOB 1-30-01). In July 2010, an order was entered by the district court of Canadian County, Oklahoma, awarding custody of K.P. to Eric and granting supervised visitation to Sandy until she completed a drug-treatment program. Both supervised and unsupervised visitation occurred thereafter until an incident occurred at a scheduled supervised visitation in October 2012. Sandy has not seen or spoken with K.P. since that time. On November 7, 2013,

Sandy filed a petition to establish paternity and for visitation. Thereafter, appellee Angela Pike, who had married Eric on October 12, 2012, filed a petition to adopt K.P.

At the adoption hearing, Sandy testified that she was a recovering drug addict. She stated that she had been directed to complete drug treatment for her methamphetamine addiction in July 2010, in order to have unsupervised visitation with K.P., and that she had completed a thirty-day program. She conceded that she had relapsed and was arrested on March 10, 2012, for using methamphetamine. She testified that since May 2013, she had been participating in drug court and was drug free. She said that she had passed fifty-eight drug tests and had been attending counseling. She said that she had been employed at Subway for nearly twenty months and was now the assistant manager. She said that she was also a full-time student, seeking her nursing degree, and had been living in the same apartment for the past year.

On the issue of visitation, Sandy said that she had only three or four supervised visits with K.P. between March 10, 2012 and October 2012. She stated that she was scheduled to have a supervised visit with K.P. at a McDonald's restaurant in October 2012, and she called the police to request that they monitor the visit. According to Sandy, when Eric and K.P. arrived and saw the police, they got upset, and Eric canceled the visit. Thereafter, she tried to contact Eric to schedule visits, but Eric ignored her, and she had not seen K.P. since. She said that she stopped requesting visitation from Eric in December 2012 because of three no-contact orders that had been entered against her.[1] She testified that the no-contact orders

---

[1] No-contact orders had been entered against Sandy in favor of Eric on April 20, 2012, March 7, 2013, and May 28, 2013.

resulted from her efforts to communicate with Eric seeking visitation with K.P., which he ignored. She said that she sent a registered letter to Eric asking for visitation in September 2012; mailed three letters to K.P.; and sent flowers to her at school for her last two birthdays. She admitted that she did not contact K.P.'s school to learn about her classes, grades, or activities and that Eric and Angela did not prevent her from communicating with the school about K.P. Sandy testified that she did not pursue visitation until November 2013 because she lacked the funds to hire an attorney. Sandy acknowledged that K.P. felt abandoned because of the lack of visitation; however, she believed that Eric had "brainwashed" K.P. into not wanting to have contact with her.

Regarding support, Sandy stated that she had never been ordered to pay child support. She agreed that every parent has the obligation to support her child but conceded that she had not sent any money to Eric for K.P. Sandy stated that she offered to give Eric child support, but he told her not to; instead, he said that she should spend her money on K.P. during their visits. Sandy said that she had accumulated two years of Christmas and birthday gifts for K.P.

Sandy concluded her testimony by stating that she did not believe that adoption was in the best interest of K.P. She acknowledged her prior mistakes but claimed that she had turned her life around, had established a home and a job, and had been sober for ten months.

Sandy's probation officer confirmed that Sandy had moved successfully through the drug-court program, passing random drug tests and complying with all other requirements. Sandy's drug-court counselor also testified that Sandy was doing very well and was nearing completion of the program. Sandy's mother and sister also testified, stating that they did not think adoption was in K.P.'s best interest.

Eric testified that when Sandy visited K.P., it was sporadic, stating that she canceled visitations for weeks at a time. He said that before March 2012, Sandy had six unsupervised visits. After her arrest in March 2012, there were approximately two supervised visits. He said that there had been no visitation since the October 2012 incident at McDonald's. Eric stated that upon their arrival, Sandy told him she had called the police, and the police arrived soon thereafter. He said that K.P. was very embarrassed by the incident. Thereafter, according to Eric, Sandy contacted him "all hours of the day and night" by text and phone to schedule visitation. He said that there were "huge stacks of communications" from Sandy, including "hundreds and hundreds" of text messages, and he agreed that he did not respond to them. He said he was protecting his child from Sandy, who was "strung out on drugs." Instead, he pursued legal action against Sandy, alleging harassment, which led to the protective orders. He stated that the communications were not just about visitation. They also included vulgarities against him and Angela.

Eric also said that he advised K.P.'s school that Sandy was not permitted to take K.P. off campus, but there were no other restrictions. He stated that Sandy could have attended conferences or K.P.'s activities. K.P.'s principal corroborated Eric's testimony. She testified that she first met Sandy in the weeks prior to the hearing when she came to the school requesting K.P.'s records, which were provided. The principal stated that Eric did not tell her that Sandy was not allowed to be at the school to visit K.P.

Eric further testified that Sandy had not given him any money for K.P.'s support. He said that he had been responsible for all of K.P.'s expenses. He said that while he never

requested any support from Sandy, she never offered him any support, and he never told her not to provide it.

According to Eric, after the McDonald's incident, K.P. no longer wanted to spend time with her mother. He stated that he often asked K.P. if she wanted to see or talk to Sandy, and K.P. said no. He said that K.P. had put that part of her life behind her because it was upsetting to her. He added that K.P. had lots of anger toward Sandy because she had put her in many bad situations. He testified that the relationship between K.P. and Angela was excellent and that adoption was in K.P.'s best interest.

K.P., who was thirteen years old at the time of the hearing, testified that she was happy living with her dad and Angela. K.P. said that her relationship with Angela was very good, stating that "she is like the best thing I ever had." K.P. said that she had good grades and had good friends. She said that her dad often asked her if she wanted to see her mom or read her letters, and K.P. said no. She said that she had received the flowers that her mom had sent but that she did not respond because she did not want to talk to Sandy. K.P. testified that the last few visits she had with her mom made her afraid and that during the last unsupervised visit in 2012, Sandy fell asleep while driving, and their vehicle rolled into a ditch. K.P. said that she wanted to live a normal life without her mother's drama and that she wanted to be adopted by Angela.

Angela testified that, initially, she encouraged the relationship between Sandy and K.P. However, Sandy's visitations were sporadic, her behavior was erratic, and then she was arrested for drug use. Angela said that K.P. was negatively affected by Sandy's actions, having her heart broken when Sandy would cancel a visit. Angela said that K.P. was very embarrassed

by the McDonald's incident and did not want to have anything to do with Sandy thereafter. Angela confirmed that Sandy sent hundreds of harassing communications to Eric all through the night in an effort to put a wedge between Angela and Eric's relationship.

Angela said that she filed the petition for adoption because she loves K.P. and that they have a very strong, loving relationship. She said that K.P. feels safe and relaxed in her and Eric's care. She said that the adoption was in K.P.'s best interest.

From the bench, the trial court granted the petition for adoption. The court found that Sandy's consent to adoption was not required pursuant to Arkansas Code Annotated section 9-9-207(a)(2) because for one year Sandy failed significantly and without justifiable cause to communicate with or support K.P. The trial court cited Sandy's testimony that her visitation and communication with K.P. was sporadic and irregular from June 2010 to October 2012. The trial court found that there had been no face-to-face visitation or phone visitation since October 2012. The trial court referenced the messages from Sandy to Eric seeking to schedule visitation, noting that Eric ignored the messages, but finding that Sandy took no action in response. The trial court also found that Sandy knew where K.P. went to school, yet she did not attend events there or contact school officials or K.P. there. Sandy's first contact with K.P.'s school was in the weeks before the hearing, and the school provided the documents Sandy requested. And while Sandy visited with her probation officer and counselor about wanting to visit K.P., Sandy did not take legal action to effectuate visitation despite her familiarity with the legal process. The trial court further found that Sandy admitted that she had failed to pay any child support to Eric, despite her continued employment. The trial court acknowledged that while Sandy was not under an order to pay support, all parents have the

SLIP OPINION

obligation to do so. Finally, the trial court found that adoption was in K.P.'s best interest. The court also weighed heavily the testimony of K.P., finding her to be a poised and level-headed young woman. The court credited her testimony that described the turmoil in her relationship with her mother and K.P.'s desire to live a normal, drama-free childhood. The trial court entered the adoption decree on May 2, 2014.

Sandy's first argument on appeal is that because she is a registered member of the Chickasaw Nation, the trial court's decree must be reversed because it failed to consider notice and remedial and rehabilitative requirements mandated by the ICWA as set forth in 25 U.S.C. §§ 1901 et seq. While Sandy's response to the petition for adoption included the allegations that she was a member of the Native American Chickasaw Nation and that Angela was required to notify the tribe and follow its adoption procedures, the record reveals that Angela served the summons and adoption petition on a Chickasaw Nation representative.[2] Beyond this point, Sandy never mentioned any ICWA issue again. She never challenged ICWA service or notice or made any other ICWA argument. Sandy's failure to raise the ICWA arguments below and obtain rulings on them is fatal to an appellate court's consideration on appeal. *Hall v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 245, at 10, 413 S.W.3d 542, 548 (holding that issue of ICWA compliance was not preserved for appeal where there was no evidence in the record that it was raised below); *Lauman v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 564, at 2 (same). Because the ICWA arguments Sandy makes on appeal were not raised below, we hold that these arguments are not preserved for appeal.

---

[2] There is no evidence that the Chickasaw Nation intervened in the action.

Sandy next contends that the adoption decree must be reversed because the trial court clearly erred in finding that her consent to adoption was not required. In adoption proceedings, we review the record de novo, but we will not reverse the lower court's decision unless it is clearly erroneous or against a preponderance of the evidence, after giving due regard to its superior opportunity to determine the credibility of the witnesses. *Hollis v. Hollis*, 2015 Ark. App. 441, at 6, 468 S.W.3d 316, 320. We have said that in cases involving minor children a heavier burden is cast upon the court to utilize to the fullest extent all its power of perception in evaluating the witnesses, their testimony, and the children's best interest; that the appellate court has no such opportunity; and that we know of no case in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as one involving minor children. *Id.*, 468 S.W.3d at 320. When the issue is one of terminating parental rights, the appellate courts have referred to the "heavy burden" upon the party seeking to terminate the relationship. *Id.* at 6–7, 468 S.W.3d at 320. Adoption proceedings are in derogation of the natural rights of parents, and statutes permitting such are to be construed in a light favoring continuation of the rights of natural parents. *Id.* at 7, 468 S.W.3d at 320.

Generally, consent to an adoption is required by the mother of the minor child to be adopted. Ark. Code Ann. § 9-9-206(a)(1) (Supp. 2013). Under certain circumstances, however, the consent of the mother may not be required. Arkansas Code Annotated section 9-9-207(a)(2)(i), (ii) (Repl. 2009) provides that consent to adoption is not required of a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause to communicate with the child or to provide for the care and support of the child as required by law or judicial decree. Additionally, before an adoption

petition can be granted, the trial court must find from clear and convincing evidence that the adoption is in the best interest of the child. *Hollis*, 2015 Ark. App. 441, at 7, 468 S.W.3d at 320; Ark. Code Ann. § 9-9-214(c) (Repl. 2009) (providing that the trial court can issue a final decree of adoption if at the conclusion of the hearing the court determines that the required consents have been obtained or excused and that the adoption is in the best interest of the individual to be adopted).

Sandy does not contest the best-interest finding made by the trial court. Instead, under the consent issue, she contends that the trial court clearly erred in finding that Sandy failed significantly without justifiable cause, for a one-year period, to provide for the care and support of K.P. as required by law or judicial decree. Sandy argues that there is no dispute that she was not under a court order to pay support. And she cites her testimony that, had Eric requested it, she would have paid it. She also cites her testimony that she offered to pay Eric support, but he declined it. She also points out that she had purchased two years of Christmas presents and birthday presents for K.P. but had not been able to give them to her because she had not been permitted to visit K.P.

Sandy's argument lacks merit. The facts were undisputed that for more than a one-year period, Sandy failed to provide any care or support for K.P. Although no order had been entered requiring Sandy to pay child support, a parent cannot turn a child's care and support over to another and thereby be excused from the duty of providing support, a duty which exists whether ordered by a court or not. *In re Adoption of Glover*, 288 Ark. 59, 62, 702 S.W.2d 12, 13 (1986). Furthermore, the trial court found that Sandy's failure was significant and without justifiable cause because she had employment the twenty months leading up to the

SLIP OPINION

hearing. Eric's testimony contradicted Sandy's, because he testified that Sandy never offered to pay him child support and that he never declined an offer from her to pay support. As for the two years of Christmas and birthday presents Sandy said she purchased for K.P., the evidence showed that Sandy knew where K.P. lived, yet there was no evidence that Sandy had tried to have the gifts delivered. Based on our de novo review, we hold that the trial court did not clearly err in finding that Sandy offered no justifiable cause for failing significantly to support K.P. for a one-year period. Therefore, we hold that the trial court did not clearly err in concluding that Sandy's consent was not required for the adoption pursuant to section 9-9-207(a)(2)(ii). Based on our holding on the failure-to-support argument, we need not address Sandy's failure-to-communicate argument.

Affirmed.

GRUBER and BROWN, JJ., agree.

*Victoria K. Morris*, for appellant.

*Clark &* Spence, by: *George R. Spence*, for appellee.