Cite as 2025 Ark. App. 496

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-25-21

| | |
|---|---|
| LEIGHANN GONZALES<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered October 22, 2025<br><br>APPEAL FROM THE JACKSON COUNTY CIRCUIT COURT [NO. 34JV-23-24]<br><br>HONORABLE ADAM G. WEEKS, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

The Jackson County Circuit Court terminated the parental rights of appellant Leighann Gonzales to her daughter, Minor Child (MC), in an order entered on October 23, 2024. On appeal, Gonzales argues that the evidence was insufficient to demonstrate that termination was in MC's best interest. Specifically, Gonzales contends that the Arkansas Department of Human Services (DHS) failed to present sufficient evidence regarding MC's adoptability. In addition, Gonzales argues that the circuit court erred in finding that MC was not competent to testify. We affirm.

I. *Factual and Procedural Background*

This case began when the child abuse hotline received a report on March 6, 2023, regarding allegations of sexual abuse perpetrated on MC by her parents, Gonzales and David

Gillis.[1] After an investigator spoke with MC, a family service worker contacted Gillis, who was unwilling to commit to an immediate safety plan. At the time, Gonzales was incarcerated. Accordingly, DHS exercised a seventy-two-hour hold on MC on March 6 and filed a petition for emergency custody and dependency-neglect on March 8. The circuit court entered an ex parte order for emergency custody the following day.

In an order entered on June 6, 2023, MC was adjudicated dependent-neglected due to abuse by an unknown offender.[2] Gonzales stipulated to this finding. The adjudication order established the goal of the case as reunification and ordered Gonzales to complete the standard welfare services.

A review order was entered on August 10, 2023. The court found that MC could not be safely returned to her parents because the parents had failed to participate in any services required by the case plan. The court ordered Gonzales to participate in family therapy and directed her to follow the recommendations of the therapist. A November 29 review order made identical findings regarding her noncompliance with the case plan. The goal of the case remained reunification, but the court ordered that a staffing be held to ensure that Gonzales understood what she needed to correct in order to achieve reunification.

---

[1]Gillis's parental rights were also terminated in this case, but he is not a party to this appeal.

[2]According to the adjudication order, a probable-cause order was entered on March 14, 2023; however, the probable-cause order does not appear in our record.

The circuit court held a permanency-planning hearing on April 9, 2024, and entered its permanency-planning order on April 12. In this order, the court authorized a plan for adoption with DHS filing a petition for termination of parental rights. Citing the evidence presented at the hearing, the court found Gonzales's testimony suspect and not credible. The court stated that Gonzales had not taken ownership of her failure to engage in the case plan and continued to blame others for her lack of participation. The court pointed out that the case plan and services had been discussed with Gonzales at various times throughout the case, but she did not fully engage in the case plan and services and had not corrected the conditions that caused removal.

DHS filed a petition for termination of parental rights on April 16, 2024, alleging multiple grounds for termination. Because Gonzales filed a motion to dismiss alleging that DHS had not alleged sufficient facts in support of its termination petition, DHS filed an amended petition specifically alleging the following grounds: twelve months failure to remedy, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2023); subsequent other factors, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*; and aggravated circumstances, Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)* (little likelihood of successful reunification).

Before the termination hearing, DHS filed a motion to excuse MC's presence at the hearing. DHS asserted that Gonzales had notified the agency that she wanted MC to be present for the hearing and intended to elicit her testimony. DHS described MC as "low functioning" and said she was currently placed in a residential placement for individuals with intellectual disabilities. DHS asserted that due to her age and functional level, MC did

not have the capacity to testify, and it would not be in her best interest to be compelled to attend the hearing.

The court held a hearing on DHS's motion on October 15. DHS repeated its arguments about MC's low-level functioning and added that it was the agency's position that she had neither information relevant to the termination of Gonzales's parental rights nor the capacity to testify as to grounds or best interest. The attorney ad litem commented that when MC had been present in court before, "she wandered around the courtroom hugging strangers––that's her level of functioning. Her IQ is 66." The ad litem added as follows:

> I don't believe that anyone could ask her questions that she could answer that would qualify her as a competent witness. I don't think she would be able to understand the proceedings. I think just the trip to court would be detrimental to her, and Judge, her behavior is so problematic and her diagnosis is so complex, that if she for some reason disrupted the placement she's in, I don't know where else we would find for her to go. This has been a very rocky road for her and I think she has diagnoses, but I do think that she's still kind of a mystery to our providers. . . . Honestly, I think even if we got her there, I just can't fathom her being able to answer appropriate questions to show that she understood what was going on.

Gonzales responded that because this was a termination hearing, one of the factors the court must consider is adoptability: "I think every ground that [the ad litem] just gave for why the child shouldn't be present in court is also a ground as to why this child is not adoptable." Gonzales urged the court to actually see MC in order to make the determination whether she had the ability to testify. The court ultimately ordered that MC appear via Zoom at the termination hearing.

The termination hearing was held the following week. Before taking testimony, the court allowed Gonzales's attorney to attempt to establish MC's competency. After observing

4

her interactions with counsel—as set out more fully below—the court concluded that MC was not competent to testify.

DHS then called family service worker Michelle Braim. Braim said that MC had been placed in foster care in 2023 due to allegations of sexual abuse. She recalled that the court had found Gonzales noncompliant with the case plan at the permanency-planning hearing. Regarding Gonzales's noncompliance, Braim testified that she had attended twenty-eight of forty-nine visits, had not maintained employment, had not completed inpatient substance-abuse treatment, had refused six required random drug screens, and did not attend staffings. Braim said Gonzales was in no better position to take custody of MC than she was when the case started. In fact, Braim said she found out the day before the hearing that Gonzales had moved back in with her mother, which was where the abuse was alleged to have taken place. Braim testified that she was unaware of any services that DHS could offer that would lead to reunification.

With respect to MC, Braim testified that she was nine years old and was in a residential treatment facility for individuals with intellectual disabilities. She said that MC had been diagnosed with an intellectual disability and had some behavioral diagnoses and adjustment disorder. She acknowledged that DHS would have to address some challenges if the goal were adoption, but she believed DHS could address those issues. She was unsure of a time frame in which an adoptive family could be found, but she was nonetheless concerned with placing MC in either parent's home. On cross-examination by the ad litem, she added

5

that because Gonzales had not completed any of the services that had been offered, she did not have the ability to care for MC.

DHS next called adoption specialist Brandy Jones. Jones said that she familiarized herself with MC by sitting in on a few staffings, talking to the supervisor and caseworkers, and looking through MC's psychological evaluation and medical records. Jones's understanding was that MC has some mild intellectual disability and some behavioral and anxiety problems, but she was not sure of her exact diagnosis. Asked if MC's disabilities would pose a challenge to her adoption, Jones said that in her experience, "most of our children have behavioral issues or intellectual issues and so it's about finding the right family for her."

Jones testified that DHS has an adoption-matching tool and described in detail how the tool works. She explained that the tool considers input such a child's health, disabilities, and special needs. She said that the tool "asks specific questions about behavior like mild intellectual, moderate intellectual" and that

> you click everything that you think that you can know about the child. And we always try to make the child seem a little bit worse because we know every child is different. And so I would prefer to make [MC] seem a little worse than what she is—like I would click to mild moderate intelligence just in case she was to ever test lower than what she [is].

In addition, there is a matching tool for adoptive parents and "things that they would accept and would not accept in their home." Such matters included "aggression, medical issues, mental health issues, stuff like that. And so if they click yes, that they would accept that, then it kind of generates and it tells how many homes would accept some of the stuff that the

child that we are searching for has." When Jones compared the data collected about MC to the data collected from people who wished to adopt, as of the day before the hearing, there were seventy-seven matches. She added that in her time as an adoption specialist, she had worked with children with needs similar to MC's needs, and those children had been adopted.

DHS's next witness was April Stokes, the Jackson County DCFS supervisor. Stokes recommended that Gonzales's parental rights be terminated. She said she had spoken with Jones and another adoption supervisor, Tessa Van, and had no concerns about finding a permanent home for MC. In her fifteen years with DHS, she said she had worked with children similarly situated to MC and had been able to find homes for them. On cross-examination, Stokes was asked if she had "made the statement before that [she] believe[s] that any child is adoptable," and she said she was sure she had.

After Gonzales testified,[3] the circuit court ruled from the bench that her parental rights would be terminated. In a written order entered on October 23, 2024, the circuit court found that DHS had proved each of the statutory grounds alleged in its petition. The court further found that it was in MC's best interest to terminate parental rights. As is relevant to the issues raised on appeal, the court stated that it expressly considered the likelihood that MC would be adopted if termination were granted, "specifically the testimony presented by the Department that although MC has challenges, a recent data match shows that there are

---

[3]None of Gonzales's testimony went to the issue of adoptability or of MC's capacity to testify, which are the only two arguments presented on appeal.

7

multiple families interested in adopting a similarly situated child, and that the issues MC faces can be overcome with adoption services." Gonzales filed a timely notice of appeal on November 4, 2024.

## II. *Standard of Review*

A court may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A); *Briggs v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 28.

We review termination-of-parental-rights cases de novo. *Parnell v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 108, at 11–12, 538 S.W.3d 264, 272–73. A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. *Martin v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 508, 657 S.W.3d 881. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Johnson v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 520, 656 S.W.3d 214. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). On appellate review, this court gives a high degree of deference to the circuit court, which is in a far superior position to observe the parties before it. *Id.*

8

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Friend v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670.

## III. *Discussion*

### A. Adoptability

In her first point on appeal, Gonzales argues that the circuit court erred in concluding that termination was in MC's best interest, specifically as it relates to the court's adoptability finding.[4] Under Arkansas Code Annotated section 9-27-341(b)(3)(A)(i), an order terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood that the juvenile will be adopted if the termination petition is granted. Adoptability is not a required finding, and likelihood of adoption does not have to be proved by clear and convincing evidence. *Duckery v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 358. We have previously explained that the Juvenile Code does not require "any 'magic words' or a specific quantum of evidence" to support a finding as to likelihood of adoption. *Sharks v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 435, at 8, 502 S.W.3d 569, 576. The law simply requires that the court consider

---

[4]Because Gonzales does not challenge either the statutory grounds or the potential-harm factor of the circuit court's best-interest finding, this court is not required to address these issues on appeal. *See Minchew v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 95, 660 S.W.3d 909; *Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, 587 S.W.3d 604.

9

adoptability, and if there is an adoptability finding, there must be evidence to support it. *Whitaker v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 61, at 13, 540 S.W.3d 719, 727.

Gonzales nonetheless asserts that the plain language of section 9-27-341 makes consideration of the likelihood of adoption "mandatory." As this court explained in *McNeer v. Arkansas Department of Human Services*, however, although we have interpreted the statute as having that meaning and mandates that the circuit court consider the likelihood of adoption, "[t]he statute does not . . . mandate that the circuit court make a specific finding that the child [is] adoptable, nor must the court find that the child [is] 'likely' to be adoptable. The statute only mandates the 'consideration' of the likelihood of adoption." 2017 Ark. App. 512, at 5, 529 S.W.3d 269, 272.

This court has long held that the testimony of a caseworker or an adoption specialist that a child is adoptable is sufficient to support an adoptability finding. *Coston v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 413, 698 S.W.3d 647; *Strickland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 608, 567 S.W.3d 870. Although Gonzales acknowledges this concept, she argues that such testimony is sufficient proof of this ground only "so long as that caseworker testified regarding the specific circumstances and characteristics of the children in the case concerned." In support of her argument, she cites *Haynes v. Arkansas Department of Human Services*, 2010 Ark. App. 28, and *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636. Both of these cases are easily distinguishable, however.

In *Haynes*, this court reversed and remanded the circuit court's termination order, finding there was nothing in the record to demonstrate that the circuit court considered

adoptability as part of its best-interest analysis because no evidence of adoptability was introduced at the hearing. In the instant case, adoption specialist Jones testified that she had utilized DHS's adoption-matching tool to compare MC's data to the data of people who wished to adopt and found seventy-seven families.

In *Grant*, the adoption specialist testified that she had not included the child's recent autism diagnosis in her search for potential adoptive parents; she nonetheless said she believed the child was adoptable because "all children are adoptable." 2010 Ark. App. 636, at 13. This court reversed the termination of Grant's parental rights because it was clear on the record that the circuit court did not consider the child's autism in determining whether he was adoptable. *Id.* Here, by way of contrast, Jones testified specifically that she input MC's characteristics and challenges into the data-matching tool, and the tool conducted an evaluation to determine whether a potential adoptive family would accept a child with MC's issues. Despite MC's special needs, the tool still revealed seventy-seven potential matches for her. In addition, Jones testified that as an adoption specialist, she had worked with other children with needs similar to MC's, and those children had been adopted.

Gonzales nonetheless challenges the basis for Jones's testimony, arguing that she lacked familiarity with MC's disposition and her diagnosis. Gonzales further accuses Jones of "manipulat[ing] the data to achieve the result of seventy-seven potential adoptive families by selectively portraying MC's disabilities, tailored to serve shifting legal goals rather than reflecting MC's actual circumstances." The record tells a very different story, however. Jones specifically testified that she tried to "make the child *seem a little bit worse* because we know

11

every child is different." (Emphasis added.) Were Jones trying to skew the data to artificially inflate the number of potential adoptive families, she would have made MC seem better, not worse.

In short, Gonzales's argument, while impassioned, is little more than a request to reweigh the evidence. For example, she asserts that the court "found that termination was in MC's best interest despite the Department's failure to introduce *credible* or sufficient evidence." (Emphasis added.) It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. *Miller v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 280, 626 S.W.3d 136; *Newman v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 207, 489 S.W.3d 186.

Testimony that a particular child is adoptable despite potential barriers can be sufficient to support a circuit court's adoptability findings. *Burns v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 367, 715 S.W.3d 531. Here, the circuit court credited DHS's evidence that although MC has challenges, she is adoptable. The court thus considered adoptability, as required by the statute, and there was evidence to support the court's adoptability finding. *See Whitaker*, *supra*. We therefore affirm on this point.

## B. Competency to Testify

In her second argument on appeal, Gonzales contends that the circuit court erred in excluding MC's testimony on the basis of her intellectual disability––i.e., the court erred in finding that MC was not competent to testify. She asserts that the court's decision to prevent

12

MC from testifying because of her intellectual disability is inconsistent with its finding that she is adoptable.[5]

As noted above, the court permitted MC to appear via Zoom before the termination hearing commenced so that it could determine whether she was competent to testify. The exchange with MC proceeded as follows:

> [COURT]: All right. [Parent counsel], you plan to call the young lady? We'll take her out [of] order. Lemme see here. Can you hear me? [MC]? Can you hear me? Can you hear me?
>
> [MC]: Yes.
>
> [COURT]: Okay, I'm going to turn my video on so that you can see me too. Can you see me?
>
> [MC]: Yes.
>
> [COURT]: Would you do me a favor? Will you raise your right hand? Do you swear or affirm that you are about to tell the truth, the whole truth, and nothing but the truth, so help you God?
>
> [MC]: Yes.
>
> [COURT]: Let the record reflect that yes, she did say yes, but after some prompting, so I'll allow you to proceed, okay?
>
> [COUNSEL]: Okay. MC, can you see me? I'm raising my hand. Can you see me? So can you see me waving at you? Okay. And what's your name?
>
> [MC]: Mommy.
>
> [COUNSEL]: Pardon? What'd you say?

---

[5]Gonzales's brief specifically states that the court's decision "cannot be reconciled with its finding that she possesses the cognitive and emotional capacity to be adopted." The court never made such a finding, however, and there is no requirement in the termination statutes that a child possess any particular capacity before the child may be adopted.

[MC]:          Mommy. Mommy.

[COUNSEL]:     You see your mom? Okay. So what's your name? What was that?

[MC]:          [MC].

[COUNSEL]:     And I'm going to ask you some questions today. Is that okay? When I ask you a question, you're going to have to say yes or no, okay? Or answer the question out loud, okay? If I told you your shirt was blue, would that be truth or a lie?

[MC]:          Yes.

[COUNSEL]:     Well, you can answer. If I told you your shirt was blue, would that be the truth? Would I be telling the truth or would I be telling you a lie?

[MC]:          No.

[COUNSEL]:     Okay. You can answer besides yes or no, you just have to answer out loud. Do you understand that, [MC]? Okay, and so what color is your shirt?

[MC]:          Pink.

[COUNSEL]:     Pink. Okay. If I told you that your shirt was blue, would that be the truth or a lie?

[MC]:          A lie.

[COUNSEL]:     A lie. Okay. And if I asked you a question, would you promise to tell the truth?

[MC]:          Yes.

[COUNSEL]:     Would you promise not to lie?

[MC]:          Yes.

[COUNSEL]:     And if you were to tell a lie, what could happen to you? What do you think would happen if you told a lie?

[MC]:        I go to a bad place.

[COUNSEL]:      You'd go to a bad place?

[MC]:        [nods head, affirmative.]

[COUNSEL]:      Is that a yes?

[MC]:        Yes.

[COUNSEL]:      And you'd get in trouble?

[DHS]:       Your Honor, I object to leading.

[COUNSEL]:      Your Honor, I'm trying to determine whether or not the child has a competency to testify. I'm not--

[DHS]:       You can't lead her down that road, though.

[COURT]:      I'll sustain the issue.

[COUNSEL]:      Sure. Okay, so [MC], you saw your mom in the courtroom today, is that correct?

[MC]:        Yeah.

[COUNSEL]:      And you've been visiting, how often do you visit with your mom?

[DHS]:       Judge, I'm going to ask you to make a--

[COURT]:      Do you have a motion?

[DHS]:       I'm going to move that [MC] be excused due to not having the mental capacity to provide testimony.

[AD LITEM]:    I agree Judge, that's been my position from the beginning. I don't think that she has really and truly on her own answered anything during this zoom period of time and I don't think that she can do so. She will not say--when asked when raising her hand--someone prompted her to

say yes. She could not answer [parent counsel] about what happens when you lie.

[COUNSEL]:    Judge--Your Honor--for the record, she didn't answer verbally but she did point down meaning that--So even though she didn't make a verbal response, she did respond if she were to lie, that she would go to the bad place and what my client said I think was an accurate reflection of what she was meaning if she lied, she would go to hell because it was bad. When children oftentimes say that type of thing, whenever they think of right and wrong, and she was asked what color her shirt was and she truthfully admitted to that. I mean I think she's proven competent.

[COURT]:    Does anyone have anything they can point to that's helpful in regard to whether or not the child . . . understands the questions and whether that child understands the difference between right and wrong and knows whether or not what the statements that they're in fact saying are true?

[DHS]:    Right. Well I think--I think the standard is whether or not the child, the witness understands the difference between right and wrong, the difference between the truth and a lie and can accept and understands the consequences of not telling the truth after taking an oath to do so. For this case, and I'm going to reference back to the motion that I filed, [MC] is in a facility for intellectual disabilities and her IQ is in the sixties which qualifies her for that type of placement. I think the other question that I have--I think one of the things the court has to find for any witness is that their testimony is relevant and I don't see how [MC]'s testimony is relevant to the petition for termination of parental rights that's currently before the court.

[COURT]:    Thank you. Well the court has observed that she struggled with understanding the nature of being sworn in and finally answered yes, but only after prompting from someone that was in the room. While it's true that she acknowledged that her shirt is pink and that you said that it was blue, it was after some prompting and a great deal of effort on the part of [parent counsel]. And then also she did point down when asked what would happen if she told a lie. I'm not going to speculate as to what that means. I don't know that any of us actually understand what that does mean. And it was after many attempts to get her to answer. Well, I don't know if it was many attempts, but it took some

16

time for her to come up with that one response. I don't know that she has the capacity. For what purpose do you [intend to] call her, [parent counsel]?

[COUNSEL]:    That the parents . . . are currently receiving visitation with her, that she enjoys that visitation and I wouldn't--this would be more along the lines of argument, but we would state in our argument that she enjoys those visits. It's in her best interest for my client's parental rights not to be terminated so that those visits can continue. It's one part of the best interest of this case. The visitation should continue. It should not be terminated given the low likelihood of adoption in our opinion.

[COURT]:    The low likelihood of adoption because of her intellectual delay?

[COUNSEL]:    And--yes.

[COURT]:    Well, that's the same reason I'm going to find that she's not fit to testify. She's going to be excused.

The question of the competency of a witness is a matter lying within the sound discretion of the circuit court, and in the absence of clear abuse, we will not reverse on appeal. *Clem v. State*, 351 Ark. 112, 90 S.W.3d 428 (2002). Any witness is presumed to be competent unless proved otherwise. *Id.*; Ark. R. Evid. 601. The party alleging that a witness is incompetent has the burden of persuasion. *Clem*, *supra*.

To meet that burden of showing that a witness is incompetent, the challenging party must establish the lack of at least one of the following: (1) the ability to understand the obligation of an oath and to comprehend the obligation imposed by it; or (2) an understanding of the consequences of false swearing; or (3) the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the fact-

finder a reasonable statement of what was seen, felt, or heard. *Holloway v. State*, 312 Ark. 306, 314, 849 S.W.2d 473, 477–78 (1993).

We have applied the same presumption and standards in deciding the capacity of a child witness to testify. *Id.* We further have noted that the circuit court's evaluation in these cases is particularly important due to its opportunity to observe the child witness and to assess the child's intelligence and understanding of the need to tell the truth. *Id.* Further, as long as the record supports a circuit court's finding of a moral awareness of the obligation to tell the truth and an ability to observe, remember, and relate facts, we will not hold that there has been a manifest error or abuse of discretion in allowing the testimony. *Ward v. State*, 2014 Ark. App. 408, at 5, 439 S.W.3d 56, 60. Finally, in determining the competency of a child witness, the circuit court will examine the child's testimony in its entirety and will not rely solely on the preliminary questioning. *Travis v. State*, 2015 Ark. App. 572, 474 S.W.3d 93.

On appeal, Gonzales argues that MC was not given a full opportunity to demonstrate moral awareness of the obligation to tell the truth or to fully show an ability to observe, remember, and relate facts. She contends that the court should have allowed more extensive questioning of MC rather than "summarily" prohibiting MC from testifying because of her intellectual disability.

To the extent Gonzales argues that the circuit court erred in not examining the entirety of MC's testimony, it is apparent from the above colloquy that she failed to raise this objection below. It is well established that failure to raise an issue before the circuit court is

fatal to an appellate court's consideration on appeal. *Crouch v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 191, 547 S.W.3d 102; *Hall v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 245, at 10, 413 S.W.3d 542, 548. Because Gonzales failed to raise this argument below, it is not preserved for appellate review. *Debiasse v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 331, 651 S.W.3d 736.

To the extent we reach Gonzales's general argument that the court erred in finding MC incompetent, we cannot agree that the circuit court abused its wide discretion in doing so. The competency of a witness is an issue in which the circuit court's evaluation is particularly important due to its opportunity to observe the witness and the testimony. *D.S. v. State*, 2013 Ark. App. 528 (citing *King v. State*, 317 Ark. 293, 302, 877 S.W.2d 583, 589 (1994)). Here, the circuit court was uniquely positioned to hear MC's testimony, observe her demeanor and her struggles with answering the questions put to her, and make a determination about her competency to testify. Indeed, the court was in a far better position to make these judgments than this court is since this court has only the cold record to review. *See Hardy v. Wilbourne*, 370 Ark. 359, 259 S.W.3d 405 (2007). As Justice George Rose Smith observed in *Moody Equipment & Supply Co. v. Union National Bank*, "[i]t is fundamental . . . that the latitude of the [circuit court's] discretion increases proportionately as the situation presents to [it] a question that cannot equally well be presented to us by the printed record." 273 Ark. 319, 321, 619 S.W.2d 637, 639 (1981).

As set out in the colloquy above, the circuit court made it clear that it based its ruling on its examination of MC's "struggle[] with understanding the nature of being sworn in" and

19

the extent of counsel's prompting and the effort it took to elicit answers from her. Given the deference we must accord to the circuit court's powers of observation in these circumstances, we cannot say that the circuit court abused its discretion on these facts.

Moreover, even if the court erred in its assessment of MC's competency, we have held that evidentiary error can be harmless if the same or similar evidence is otherwise introduced. *Ward v. State*, 2014 Ark. App. 408, 439 S.W.3d 56. Gonzales represented to the court that she wanted to call MC to elicit her testimony that she enjoyed visitation with her parents. Gonzales herself, however, testified that the visits went well and that they were happy to see each other. Because the same evidence that Gonzales wanted to offer through MC was introduced via her own testimony, we cannot say that the exclusion of MC's testimony was reversible error. *See Howard v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 68, 512 S.W.3d 676 (holding that exclusion of evidence is not prejudicial if the same evidence was introduced through another source and was before the trier of fact for its consideration).

We therefore hold that the circuit court neither erred in finding that MC is adoptable nor erred in concluding that she was not competent to testify. As such, we affirm the termination of Gonzales's parental rights.

Affirmed.

BARRETT and WOOD, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.