Cite as 2025 Ark. App. 28

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-24-608

| | |
|---|---|
| DEAUSHALIEGH BRIGGS<br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>APPELLEES | Opinion Delivered January 22, 2025<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FJV-22-519]<br><br>HONORABLE ANNIE POWELL HENDRICKS, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

Deaushaliegh Briggs appeals from the Sebastian County Circuit Court's termination of her parental rights to her minor child, MC.[1] On appeal, Briggs argues that the Arkansas Department of Human Services (Department) failed to prove that termination was in MC's best interest because there was insufficient proof that MC would be subject to potential harm if returned to her care. Because there was sufficient evidence to support the circuit court's best-interest finding, we affirm.

---

[1]Briggs was unmarried at the time of MC's birth, no father was listed on the birth certificate, and no affidavit of paternity was filed. Cody Kimbley was identified as the putative father, but a DNA test later determined that he is not MC's biological father. As a result, Kimbley was subsequently dismissed from the action.

Briggs gave birth to MC on August 23, 2022. The next day, the Department received a Garrett's Law referral due to Briggs's use of methamphetamine and THC. As a result of the referral, the Department opened a protective-services case and began providing services to Briggs, including treatment at Gateway Recovery Center (Gateway).

On December 29, 2022, a Gateway staff member alerted the Department that Briggs was being discharged for behavioral violations and would be unable to complete the program. Gateway reported that Briggs had been leaving MC unsupervised and was not properly caring for her; that is, Briggs was feeding MC only once a day and, on at least one occasion, had left the child diaperless. When Briggs broke quarantine after she and MC tested positive for COVID-19, Briggs was discharged from the program.

Because Briggs did not have a place to go upon her discharge from Gateway and because of the circumstances surrounding her discharge, the Department placed a seventy-two-hour hold on MC.

On December 30, the Department filed a petition for dependency-neglect and emergency custody. An amended petition was filed on January 3, 2023. In the affidavit accompanying the amended petition and incorporated therein, the family service worker (FSW) attested to the facts surrounding MC's removal. The FSW also stated that the Department had first became involved with Briggs in September 2017 after Briggs was arrested for selling methamphetamine to an undercover police officer. Her arrest resulted in the removal of one of MC's siblings, MC1, and the filing of a dependency-neglect action. During the course of that case, Briggs agreed to voluntarily terminate her parental rights to

2

MC1, and MC1 was adopted. The affidavit further stated that Briggs had also placed an older sibling, MC2, up for adoption. Although, the circumstances surrounding MC2's adoption were not relayed in the affidavit, the record reflects that Briggs had attempted an open adoption, but the adoptive parents would not allow her contact with MC2.

The court issued an ex parte order of emergency custody that same day and set the probable-cause hearing for January 4, 2023.

The probable-cause hearing was held as scheduled. After the hearing, the court entered a probable-cause order finding that the emergency conditions that necessitated MC's removal continued so that it was necessary that MC remain in the custody of the Department.

An adjudication hearing was held on March 8 and March 29, after which the circuit court found MC dependent-neglected as the result of parental unfitness due to substance abuse and inadequate supervision. The court set reunification as the goal. Briggs was ordered to obtain and maintain income, transportation, and appropriate housing. She was also ordered to submit to random drug screens; attend parenting classes; undergo a drug-and-alcohol assessment and comply with the recommended treatment; and attend counseling. Finally, the court specifically ordered her to undergo a psychological examination and to submit to a ninety-day extended-panel hair-follicle test.

A review hearing was held on June 21. The goal of the case remained reunification with an additional concurrent goal of adoption following termination of parental rights. The review order noted that, during the last reporting period, Briggs had been incarcerated

3

multiple times, had been readmitted to Gateway, and had lived in a shed on her mother's property. The court also noted that, although Briggs had completed the twenty-eight-day program at Gateway, she was unable to be admitted into the transitional-living program due to incarceration. Briggs admitted she had relapsed again and had planned to reenter Gateway but left the program without completing it. The court remarked that Briggs had not attended the drug-and-alcohol assessment, had not kept her hair-follicle-test appointments, had failed to complete her psychological assessment, and had been inconsistent in providing her contact information. As a result, MC remained in the custody of the Department.

At the permanency-planning hearing on December 13, the court changed the goal of the case to adoption following termination of parental rights after finding that Briggs had not made significant or measurable progress, More specifically, the court stated:

> 9.   During the review period the mother has not done well. She has had sporadic contact with the Department. She showed up at the DCFS office on 10/26/2023. She was drug screened and was positive for methamphetamines. She confirmed that she was 30 weeks pregnant. She was reassessed at Gateway on 11/9/2023 and was eligible for re-entry to [inpatient] treatment, but she left again against medical advice on 12/4/2023. Gateway confirmed she was 36 weeks pregnant at the time. The Department is currently unaware of her location. Out of 46 family time visits, the mother has attended only 20.

Thereafter, in March 2024, the Department filed a petition for termination of parental rights. As for statutory grounds for termination, the petition alleged twelve-month failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Supp. 2023)); subsequent other factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*)); and aggravated circumstances (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*)). The petition recited the factual history of the case and

4

noted that Briggs had given birth to another child on December 23, 2023, and that at the time of that child's birth, both MC's and Briggs's urine had tested positive for methamphetamine. The petition averred that, despite meaningful reasonable efforts by the Department to provide services to Briggs, the conditions that caused MC's removal had not been remedied; that Briggs had not manifested the capacity to remedy the issues of subsequent drug use, unstable employment, unstable transportation, and the general chaos in which she has been living; and that there was little likelihood that any additional services would remedy her issues. As to adoptability, the Department noted that MC is a healthy infant who was in a placement that was ready to adopt. As for potential harm, the Department noted that Briggs is an unstable parent who continued to use drugs. Thus, considering MC's adoptability and the potential harm of returning MC to Briggs, the Department asserted it was in MC's best interest to terminate Briggs's parental rights.

The termination hearing was held on April 3, 2024. At the start of the hearing, the Department introduced the case plan and the court's prior orders; MC's umbilical cord toxicology report;[2] a November 16, 2022 drug-and-alcohol assessment;[3] a packet of drug

---

[2]MC's umbilical cord toxicology report indicated the presence of THC in her system.

[3]The assessment reported that Briggs had extensive mental-health and substance-abuse concerns. It stated that Briggs had a history of using marijuana, alcohol, and methamphetamine with her mother. The report further stated that Briggs had been diagnosed with disorganized schizophrenia, unspecified personality disorder, ADHD, and ODD. The assessing clinician noted that these diagnoses typically need medication management and extensive therapy services to manage, but Briggs had not had regular medication management in the last five years. The clinician recommended substance-abuse treatment as well as a treatment program to manage her mental-health needs The clinician

5

screens from October 19, 2022, to October 26, 2023;[4] a letter reflecting Briggs's successful completion of a thirty-day drug-treatment program; two discharge letters dated May 30 and December 5, 2023, stating that Briggs had chosen to abort treatment; and a copy of Briggs's psychological evaluation.[5] The court also admitted an August 9, 2023 hair-follicle screening positive for methamphetamine; judgments of conviction for possession of an instrument of crime, possession of drug paraphernalia, and possession of a controlled substance; and a

---

further noted Briggs had limited insight into her sobriety or her responsibility in parenting and that her views were immature and unrealistic, including the failure to recognize the threat of harm her mother posed to both her and MC as a result of her mother's addiction.

[4]The drugs screens were a mix of positive and negative results with the majority of positive results denoting marijuana use.

[5]In Briggs's July 2023 psychological evaluation, Dr. Martin Faitak provided the following conclusions:

> [Ms. Briggs] was seen for evaluation due to her desire to retain custody of her child. Test results suggest a negative bias. Based on history and testing, Ms. Briggs meets criteria for the diagnosis of methamphetamine use disorder, post-traumatic stress disorder, and major depressive disorder. She was primarily raised by her maternal grandmother and felt disconnected and unwanted by her parents. They were involved with drugs. Ms. Briggs was in foster care and was molested. She had a live-in boyfriend at age 14. Ms. Briggs completed the 9th grade. She has made poor choices in men since that time. Currently, Ms. Briggs reports intrusive memories and nightmares. She seems anxious, worried, and stressed. Social interaction makes her uncomfortable. She is distrusting, has low self-esteem, and may have problems focusing. She reports significant suicidal ideation.

> Of the skills and capacities normally required for parenting, Ms. Briggs appears to have weaknesses in self-esteem, warmth, openness, and trust. She has not been able to maintain attachments. She is currently unemployed and homeless. Ms. Briggs has not demonstrated good judgment. She has problems resolving conflicts and maintaining stable mood.

current arrest warrant for contempt of court. Finally, the court admitted court records from the dependency-neglect cases involving MC1 and her newest half sibling, MC3.[6]

Three witnesses also testified: FSW Cathleen Agenbroad; Briggs; and Briggs's recovery coach from Harbor House.

Agenbroad testified that she was the FSW assigned to Briggs's case. She stated that the Department offered Briggs drug-and-alcohol assessments, inpatient services, hair-follicle and random drug screens, individual and group counseling, parenting classes, visitation, transportation, and multiple inpatient assessments. Concerning Briggs's progress, Agenbroad testified that, while Briggs was currently in compliance with the case plan, Briggs had made little progress and had no stability during the pendency of the case, and Agenbroad did not believe completing all the services would change her behavior. She testified that Briggs had initially completed a twenty-eight-day treatment program at Gateway, which included parenting classes, but had been unable to enter a transitional-living program because she had been arrested and spent three days in jail. She stated that, after that, Briggs had again attempted to complete treatment two additional times but failed to do so. She stated that Briggs had been administratively discharged in May 2023 after she walked out of the program and was again discharged in December 2023. Agenbroad testified that, while Briggs was currently in a treatment program and had been since mid-March, it was necessary

---

[6]The court also admitted the DNA evidence precluding Kimbley's status as MC's biological father; a copy of MC's birth certificate showing no father was listed; and a copy of a putative-father registry search showing no results.

7

to extend Briggs's stay because she was briefly placed in a higher level of care in order to receive medication management after reporting thoughts of self-harm.

Additionally, Agenbroad testified that Briggs had not had stable employment or housing at any time during the case and that Briggs had attended only forty-five of the seventy-five 4-hour visits with MC over the past year. Those visits were ultimately suspended in February 2024 due to Briggs's behavior and MC's reaction to the visits. Although Briggs had requested that visits be reinstated and that MC be placed with her at the treatment facility, the Department rejected the placement request because it believed Briggs needed to focus on her treatment. Moreover, at the time, Briggs's visits were still being supervised, and the Department was concerned that MC's care would not be supervised at the treatment facility. As for housing, Agenbroad acknowledged that Briggs's current treatment facility offered transitional living, including housing and other services, upon her completion of treatment, if she qualified.

However, given Briggs's lack of progress, Agenbroad opined that MC would not have a home, be protected, or be emotionally supported if returned to Briggs's care. As such, it was her opinion that MC would be at risk of harm if returned to Briggs. In fact, she testified to her belief that MC would be psychologically and emotionally traumatized if reunited with her mother.

As for adoptability, Agenbroad noted that MC had been placed with her current foster family since she was four months old and that the foster family had expressed an

interest in adopting her. She also identified approximately 355 other potential adoptive homes.

Briggs testified next via Zoom. She stated that she was currently in treatment in Hot Springs and asserted that her current treatment program was different than the other programs she had previously attended. She explained that in her current program, she was undergoing ACTS therapy, or psychological flexibility, which involves committed action, mindfulness, willingness, and acceptance. She claimed that she felt like she was having more success in this program than her previous programs. She stated that it was also helpful to her recovery that she was no longer in Fort Smith. She testified that she could obtain specialized women's services in her transitional-living program if MC were allowed to live with her. Additionally, the transitional-living program would help her obtain transportation and employment.

As for her overall stability, Briggs admitted that there was currently a warrant for her arrest for failure to pay fines but claimed she would resolve that once she obtained employment. She further denied that her housing had been unstable during the pendency of the case, noting that she had stayed with her mother at one time. She denied that her mother has a methamphetamine problem but admitted that her mother had been arrested on methamphetamine charges.

Aimee Dolbec, Briggs's recovery coach, was the last witness to testify. She testified that her job entailed helping clients with resources once they leave treatment, including transitional-living housing and employment. As part of her duties, she has weekly visits with

9

Briggs. She testified that Briggs had attempted to reestablish visitation with MC upon her return to the facility after receiving medication-management treatment. She stated that the Department never indicated that visitation would not be allowed.

Finally, Dolbec described Briggs's progress since her arrival at the treatment facility. Dolbec testified that when Briggs first arrived at the facility, she could not deal with her emotions. Now, she could sit with her emotions and process them, and if she gets agitated, she is able to face her feelings and use the methods taught in the program—like mindfulness and calming breaths—rather than running from them. Dolbec said the transitional-living program is located right next to the residential treatment facility and that Briggs would also benefit from longer care in the specialized women's services program, which is also housed on the property. Briggs would be able to stay in that program for up to eighteen months.

Following the termination hearing, the circuit court entered an order terminating Briggs's parental rights. The court found that the Department had proved all three statutory grounds and that termination was in MC's best interest. In so doing, the court noted that MC deserves permanency, and while Briggs was currently in treatment, she had relapsed and been discharged from treatment multiple times throughout the case and had a current warrant. Briggs appealed the court's termination decision.

We review termination-of-parental-rights cases de novo. *Heath v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 255, 576 S.W.3d 86. We review for clear error, and a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* A court

10

may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2023), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

On appeal, Briggs challenges only the potential-harm prong of the best-interest finding. In assessing the potential-harm factor, the circuit court is not required to find that actual harm would result or to identify specific potential harm. *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915. Potential harm must be viewed in a forward-looking manner and in broad terms, but a court may consider a parent's past behavior as a predictor of future behavior. *Id.* at 12, 555 S.W.3d at 921.

Sufficient evidence supports the court's best-interest finding in this case. The Department provided appropriate services, but the evidence was uncontroverted that throughout the entirety of the case, Briggs lacked stable income or housing, and she consistently failed to remain drug-free despite multiple attempts at inpatient rehabilitation. At the hearing, Briggs claimed that her situation was "pretty stable" during the three to six months she lived with her mother; however, it is undisputed that her mother had been incarcerated for selling methamphetamine, so the adequacy of that stability was questionable.

Moreover, while it appears that Briggs had, once again, completed or nearly completed an inpatient-treatment program at the time of the termination hearing, she had yet to demonstrate an ability to maintain sobriety, employment, or housing outside the treatment-program setting and had yet to progress to unsupervised visitation with her child. A child's need for permanency and stability may override a parent's request for more time to see if the parent can change his or her behavior. *Johnson v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 274. Accordingly, the circuit court did not clearly err in terminating Briggs's parental rights.

Affirmed.

ABRAMSON and GLADWIN, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.